UNITED STATES of America, Plaintiff,

v.

Deric FRANK, Defendant.

No. 97 CR. 269(DLC).

United States District Court,
S.D. New York.

May 6, 1998.

Mary Jo White, United States Attorney, Southern District of New York, New York, NY, John Hillebrecht, Kerry Lawrence, Assistant United States Attorneys, for U.S.

Leonard Joy, Jonathan Bach, Legal Aid Society, Federal Defender Division, New York, NY, Kevin McNally, McNally & Robinson, Frankfort, KY, for Defendant.

## OPINION

COTE, District Judge.

In this capital prosecution, the defendant, Deric Frank ("Frank") is charged with abducting his former girlfriend, Shaneika Price ("Price"), transporting her across state lines, and killing her by setting fire to the car after locking her in the trunk. Frank has filed numerous motions challenging, among other things, the constitutionality of the statutes under which he is prosecuted, the sufficiency of the Indictment in this case, and the admissibility of certain of the Government's evidence. The Court has already issued an Opinion addressing Frank's challenges to the statutes and the Indictment. In this Opinion, the Court will address Frank's motion to suppress his statements made to the police following his arrest on March 13, 1997, and certain evidence found by the police pursuant to a search warrant executed on March 14. The Opinion follows two days of hearings on the suppression motions—at which Frank did not testify—and post-hearing briefing by both parties.

## I. BACKGROUND

### A. The February 21 Restraining Order

Frank and Price had a complex relationship that spanned many years and was punctuated by disharmony. In 1991, Price gave birth to a son, Jonathan Price, whom she claimed was fathered by Frank, and whom Frank, at times, acknowledged as his son. Just three weeks prior to her death, Price applied for and obtained an order of protection against Frank. The order, which was based on a pre-printed form filed in Connecticut Superior Court, was entered by the court on February 21, 1997. The order required that Frank

Refrain from imposing any restraint upon the person or liberty of the applicant [Price].

Refrain from threatening, harassing, assaulting, molesting, sexually assaulting or attacking the applicant.

Refrain from entering the family dwelling or the dwelling of the applicant.

On March 5, 1997, Price filed a harassment complaint against Frank with the Norwalk Police Department. Price's statement in support of her complaint, which was reduced to writing by Police Officer Shawn Morin and approved by Price, stated:

Deric Frank who is my ex-boyfriend has been physically and emotionally abusive in the past towards me. I have observed Deric Frank following me and sitting in front of my residence waiting for me to come home. Deric Frank has also tried to followed [sic] me to my place of employment. I loose [sic] him so he doesn't follow me to work and cause a scene. Deric Frank has also called my place of employment numerous times. I went to the Stamford Court house on 02/21/97 and filed for a restraining order against him and it was served on him. I filed for this restraining order do [sic] to I am concerned for my safety and the safety of my child do [sic] to Deric's actions in the past. Scenes [sic] the restraining order was served on Deric Frank he has called my place of employment and has come past my residence watching me and calls my house. On this date 03/05/97 Deric Frank called

my place of employment and was also in front of my residence upon me [sic] getting home.

On the basis of Price's March 5, 1997 complaint, Officer Morin prepared on that date a "Complaint and Incident Report" which documented Price's complaint and set forth Morin's intention to arrest Frank for violation of the February 21 restraining order if he were able to locate Frank prior to the end of his tour. In the alternative, Morin indicated that he would apply for a warrant for Frank's arrest.

### B. The March 10 Arrest Warrant

On March 9, 1997, Morin prepared an Arrest Warrant Application ("Application"), a two page document containing in its body a six paragraph affidavit by Morin. At the bottom on each page of the Application, the judge's signature attests that the judge has read the affidavit and finds probable cause. Morin's affidavit in support of the application repeated the facts conveyed in Price's March 5 complaint—namely, that Price had obtained a restraining order against Frank on February 21, and that, since that time, Frank had followed and called Price repeatedly and waited for her outside her residence. The affidavit also specifically recounted that Price had stated that "she was afraid of Deric Frank and when she sees him around her residence she runs into her residence and locks the doors so she doesn't have any contact with him." The affidavit further set forth Morin's contacts with Frank on the telephone and his unsuccessful efforts to secure Frank's cooperation.

The affidavit did not indicate the offense for which Morin believed an arrest warrant was appropriate. It did, however, state that Morin had advised Frank that if Frank did not cooperate, "a[n] arrest warrant would be filed against him for violation of the restraining order." In its final paragraph, the affidavit stated:

[T]his officer respectfully requests that this arrest warrant be issued for Deric Frank do [sic] to this is a domestic problem and it appears to be a on going [sic] problem which has been physically and emotionally abusive in the past towards

Shaneika Price. That I gave Deric Frank every opportunity to come to headquarters and speak to this officer regarding this matter. That Deric Frank's actions towards this officers [sic] attempts to speak to him resulted in a negative ending in this CO-operation [sic].

The pre-printed findings of probable cause that appear on the bottom of each page of the Application, to which the judge affixed his signature on March 10, similarly do not state the offense for which the warrant was approved. Rather, the findings state simply that

> there is probable cause to believe that an offense has been committed and that the accused committed it and, therefore, that probable cause exists for the issuance of a warrant for the arrest of the above-named accused.

Also on March 10, Morin prepared an arrest warrant and an "Information." The arrest warrant, which did not require any designation as to the offense for which arrest was authorized, also was signed by the judge on March 10. Unlike the Application and warrant, the Information specified that Frank had violated Connecticut General Statute Section 53a–107, which defines criminal trespass in the first degree. In his affirmation filed in support of the Government's opposition to the Defendant's motion to suppress,[1] Morin explained that his decision to cite the criminal trespass statute reflected the Norwalk Police Department's general practice of charging persons who have violated orders of protection with this infraction. Morin explained:

> The restraining order [issued upon Price's application], like all such orders with which I am familiar, contains a specific citation to

the criminal trespass statute, stating (consistent with that statute) that "entering or remaining in a building or any other premises in violation of this order constitutes criminal trespass in the first degree." In my experience, where it is credibly alleged that an individual has violated such an order by following someone from their home and work place and waiting for that person at their home, we typically charge that individual with criminal trespass.

Morin further stated that, although he cited only the criminal trespass statute in the Information, he was aware of several statutes that Frank could be found to have violated based on Price's complaint. Indeed, Morin stated that, at the time he executed his affidavit in support of the arrest warrant, he knew based on his training and experience that "probable cause existed" to believe that Frank had also violated, at a minimum, Connecticut's harassment and stalking laws, Sections 53a–183 and 53a–183, respectively. The choice to cite the criminal trespass statute in the Information reflected, as indicated above, the convention in the police department and the fact that Connecticut's standard order of protection explicitly incorporates the criminal trespass statute.

### C. Frank's March 13 Arrest in Florida

Price's body was found by New York police on March 11, 1997. In the early morning of March 12, Frank boarded a bus in New York that was headed to Florida. Upon a tip from an aunt of Frank's who lived in Florida, a night-duty agent with the Federal Bureau of Investigation ("FBI") learned that Frank was due to arrive in the state by bus on the morning of March 13 and that he was "wanted in connection with the murder of his girlfriend." The tip was referred to the Vio-

---

1. The Court considers Officer Morin's affirmation part of the evidentiary record before it in light of the irregular procedural posture that Frank has adopted with respect to his suppression motion. Frank did not raise any challenge to the Connecticut arrest warrant until he filed his post-hearing briefs following two days of suppression hearings. Those hearings focused on the voluntariness of Frank's statements once he was taken into custody, and the level of Federal involvement in his arrest. Only at the very end of those hearings—when all of the evidence was in—did Frank raise his other, related challenge

to his arrest, discussed at length below, that his arrest in Florida on the basis of the Connecticut warrant was unlawful. The Court therefore is in the peculiar position of having to make findings of fact and conclusions of law with respect to arguments that were not before the Court at the suppression hearing, and for which no testimony was offered. Since neither party has requested a new hearing to address these issues, the Court will make the necessary findings on the basis of the evidence that was submitted without objection in support of the parties' post-hearing briefs.

lent Crimes/Fugitive Task Force for South Florida and the Caribbean (the "Task Force"), which is comprised of agents of the FBI and state and local police officers. Using the national computerized "NCIC" system, the Task Force verified that a misdemeanor warrant was outstanding for Frank's arrest and that he was wanted for questioning by New York police as a suspect in the murder investigation. At approximately 10:20 a.m. on the morning of March 13, Frank was met at the Fort Lauderdale bus station by a team of seven or eight members of the Task Force, led by Fort Lauderdale Police Detective David Dittman. As was customary, a state—as opposed to a federal—member of the Task Force was assigned to lead the arrest team, because the fugitive was wanted on state charges.

The following facts are based on the testimony of Detective Dittman and FBI Special Agent Talarah Gruber, another member of the Task Force who was present at Frank's arrest, and the documents that were admitted into evidence in the course of their testimony.[2] When Frank stepped off the bus, Detective Dittman and a few other officers calmly approached him, with guns held at their sides, having recognized him from a photograph they had been provided. Frank at first denied his identity, but then conceded that he was Deric Frank. The officers handcuffed Frank, patted him down, and read him his Miranda warnings. Frank indicated that he understood his rights, and also indicated that he was willing to speak. The Court finds on the basis of this evidence that Frank knowingly and voluntarily waived his rights protected by the Miranda warnings.

Frank was informed that he was being arrested on a warrant from Connecticut, and that there were detectives from New York who wanted to speak to him about another matter. When the officers asked Frank if he knew why they were there, he said something to the effect of, "Yeah, they say I killed my son's mother, but I didn't do it." Having first checked to see if Frank had any luggage on the bus—he had none—the officers transported Frank to the Fort Lauderdale police city jail, only a five minute drive from the bus station. Thereafter, Frank was transferred to a county jail where he was held on the Connecticut charges. Had he been arrested on federal charges, Frank would have been taken to a federal facility. Special Agent Gruber chatted casually with Frank in the car on the way to the city jail and found Frank talkative, alert, and articulate. The involvement of the federal members of the Task Force ended when Frank was delivered to the city jail.

At the city jail, Dittman filled out the paperwork necessary to process Frank's arrest. The documents prepared by Dittman show that Frank was arrested on the Connecticut warrant for criminal trespass in the first degree. That paperwork was accompanied by copies of telexes sent between the Fort Lauderdale police and the Norwalk police confirming that Frank was wanted on a misdemeanor warrant for criminal trespass in the first degree, that Connecticut wished no bond to be permitted, and that it wished to extradite Frank. In addition, the telexes sent from Connecticut indicated that Frank was a suspect in a New York homicide.

**2.** The testimony given by Dittman and Gruber concerning the circumstances of Frank's arrest was corroborated by the testimony given by Detective Christopher Dale of the Broward County Sheriff's Office and Special Agent Sean Patrick Boyle of the FBI, both of whom were present at the bus station.

Frank submitted an affidavit in support of his motion to suppress setting forth his recollection of the events in question. There are two material differences between his version of the events at the bus station and that given by the law enforcement officers: first, Frank alleges that he was not informed of any charges against him except for a homicide; second, he alleges that he was not read his Miranda warnings. The Court accords the same weight to Frank's allegations concerning the events at the bus station as it does to all of his other allegations set forth in the affidavit. Since Frank did not testify at the hearing, and was not subject to cross-examination, the Court was unable to form an opinion as to his credibility or the truthfulness of his allegations. In contrast, each of the law enforcement witnesses who testified at the hearing appeared forthright and truthful. Accordingly, the Court notes those instances in which Frank's recollection of the events differs from that of the other witnesses, but finds that this circumstance carries little weight.

D. *Frank's Interrogation on March 13 and 14*

Frank was taken into an interviewing room at the Fort Lauderdale city jail. Dittman introduced Frank to Detectives John Bourges and Robert Fox, two police officers from New York who had arrived on the scene, and whom Dittman had already informed that Frank was being cooperative and had been "Mirandized." Before Dittman stepped out of the interviewing room, it appeared to him that Frank was eager to talk to the Detectives. Frank did not ask to make a phone call or to speak to a lawyer.[3]

New York City Police Detective Bourges testified to the circumstances of his interview with Frank. Bourges' recollections were confirmed and supplemented by Detective Fox's testimony. When Frank was brought into the interview room at the Fort Lauderdale jail, Bourges explained to Frank that he would like to speak with him about the death of Shaneika Price. Bourges also told Frank that, before he spoke with him, he would read him his Miranda warnings. Bourges proceeded to read Frank his rights from a pre-prepared sheet. Frank indicated verbally that he understood each of his rights as they were read to him. Frank also affixed his initials six times to the sheet from which Bourges read, indicating that he understood the rights that had been read to him, and that he wished to answer questions. He also wrote his complete signature at the bottom of the page. Bourges affixed the notation "1315hr"—*i.e.,* 1:15 p.m.—next to Frank's signature to indicate the time at which the warnings were administered. The Court finds on the basis of this evidence that Frank knowingly and voluntarily waived his rights for a second time.

Bourges observed that Frank was eager and willing to speak with the officers, and that he appeared to want to "set the record straight." Fox stated that Frank "wouldn't shut up" and communicated that he felt he had been set up. Frank appeared to both detectives to be alert and cognizant of his surroundings and answered each question clearly and concisely. He did not appear to be under the influence of any narcotics or alcohol. The detectives asked Frank if he wanted anything to eat or drink, to which Frank responded that he was not hungry but wanted a soda. The detectives got Frank an iced tea. At no time during the interview did Frank ask to speak with a lawyer or to use a telephone.[4] Throughout the interview, Frank was not handcuffed and the officers did not raise their voices or draw their weapons. Frank, who was seated at a table during the interview, occasionally became emotional in talking about Price; at some points he banged on the table, and at least once he threw a chair.[5]

As the interview went on, Frank was given several breaks, which together amounted to approximately three hours. Frank also was allowed to use the bathroom and was given pizza. After each break, the officers asked Frank whether he wanted to continue, and each time he indicated that he did. At no point did Frank indicate that he wanted to stop the interview. Sometimes the detectives turned off the lights at Frank's request during the breaks, and on one occasion Frank was positioned on the floor with his eyes closed when the detectives returned. Each time, upon the detectives' return, Frank resumed the interview with no hesitation and no difficulty. At no point did Frank appear incoherent or to have trouble understanding what was being said. During the course of the interview, Frank participat-

---

**3.** Frank alleges that he asked to make a phone call before the interview began, and that he was told that he would not be permitted to make a phone call until after the detectives had spoken with him.

**4.** Frank's affidavit indicates that he asked several times to be permitted to make a phone call so that he could get in touch with a lawyer, and that he was told that he could not do so until the interview was completed.

**5.** Frank alleges that it was the detectives who banged on the table. He also alleges that on March 14 the detectives told him that if he did not confess to Price's murder, they would ask the prosecutor to seek the death penalty. At the hearing, both detectives denied that they had ever mentioned the death penalty. The Court finds on the basis of all the evidence that no reference was made to the death penalty during the March 13 and March 14 interviews.

ed in the preparation of a written statement recounting his relationship with Price and his whereabouts on the days of, and just before, her death. One of the things that Frank told the detectives during the March 13 interview was that he had changed his clothes on March 11 at the house of Cynthia Greene, where he often stays.

At the end of the March 13 interview— which actually concluded early on March 14—the detectives asked Frank whether they could continue with their interview later that day. Frank indicated that he was willing to do so, and the officers made arrangements to interview Frank again after he had been transported to the Broward County jail. While he was being transported from the city jail to the Broward County jail, Frank asked to use a telephone.

On March 14, Detectives Bourges and Fox resumed their interview with Frank. They greeted him and again read him his Miranda warnings. Again, Frank indicated verbally and in writing, by initialing and signing a Miranda warning form, that he understood each of his rights and was willing to answer questions. This form was executed at 12:20 p.m. on the 14th. The Court finds on the basis of this evidence that Frank knowingly and voluntarily waived his rights for the third time following his arrest. As was true the day before, Frank appeared eager to speak with the detectives on March 14. At no point did he ask to make a phone call or contact a lawyer. Likewise, as during the prior interview, Frank was not handcuffed and he appeared to be alert and cognizant of his surroundings.[6] During this interview, the detectives showed Frank photographs of Price; at times he became emotional, and at one point during the interview Frank tipped over the table in the interview room.

### E. *Frank's Presentment to the Magistrate on March 15*

Frank's interview on March 13 ended sometime around midnight, after which he was brought back to the holding facility at the city jail to await transport to the Broward County jail. The processing documents at the city jail indicate that custody of Frank was transferred from the Fort Lauderdale city jail to the Broward County jail at 1:25 a.m. on March 14. Frank was not taken to the county jail earlier on March 13 because he was still being interviewed at 4:00 p.m. and at 8:20 p.m., the scheduled times at which the two daily buses depart to transport prisoners to the county jail.

The processing documents from the Broward County jail indicate that Frank was booked there at 7:21 a.m., and was held on the basis of the Connecticut warrant for criminal trespass in the first degree. Frank was presented to a magistrate judge on March 15. According to Dittman, Frank would have to have been booked by 4 a.m. at the latest on March 14 in order to appear in court on March 14. Arrestees are presented at 8:00 or 8:30 a.m. in the Fort Lauderdale court, and there are no afternoon presentments. A two day span between arrest and presentment is not unusual in Broward County, and there was no deviation in this case from the County's customary processing and presentment procedures.

Frank was presented to the magistrate judge on March 15 via videocamera. First, while awaiting arraignment, Frank was shown a pre-recorded videotape of a magistrate judge reading detainees their Miranda rights and advising them of additional rights and procedures. Next, the magistrate judge who was present in the courthouse viewed Frank via videocamera. He determined that Frank would be held without bond pending extradition. At the hearing, this Court viewed the videotape that Frank was shown advising him of his Miranda rights, as well as a videotape that depicted Frank's presentment before the magistrate. Through the use of a spit-screen device, the videotape displayed the magistrate judge on one screen and Frank on the other screen, as each would have viewed the other. The Miranda

---

**6.** On March 19, Detective Fox returned to Florida and conducted another interview with Frank. On that date, Fox again asked Frank whether he wished to speak with him. Frank said that he did, and Fox again read Frank his Miranda rights and Frank initialed the form indicating that he understood his rights but wished to answer questions. The statements made by Frank on March 19 are not the subject of Frank's motions regarding voluntariness.

warnings that Frank was shown were extremely thorough and comprehensible. At his presentment, Frank looked alert and appeared to be in full control of his faculties. With his consent, Frank was eventually extradited to Connecticut.

### F. The March 12 and 14 Search Warrants

Simultaneously with the investigation by Detectives Bourges and Fox in Florida, police officers in Connecticut were investigating Frank's connection to Price's death.[7] On March 12, two members of the Stamford Police Department, John J. Cahill and James McCauliffe (neither of whom were called to testify at the hearing), prepared an affidavit to submit to Connecticut Superior Court in support of an application for a warrant to search Frank's car, a 1992 Honda Accord owned by his sister but actually operated by Frank. The officers swore that they had probable cause to believe that Frank's car would contain, among other specified items, bodily fluids, shoeprints, fingerprints, weapons, and accelerant materials that might link Frank to Price's death. Their affidavit further set forth the following facts: (1) on March 11, a human body was found in a burned-out tan 1993 Toyota Corolla near the Cross Bronx Expressway; (2) on March 11 at 11:00 a.m., Price's mother reported her daughter missing to the Norwalk Police Department after receiving a call from Price's place of employment informing her that Price had not arrived for work; (3) Price's mother reported that Price had been involved in "recent family violence incidents with a male known as Deric Frank;" (4) Price's mother feared for Price's safety; and (5) Price owned a tan 1993 Toyota Corolla.

The affidavit further stated that Norwalk police had found blood stains in the area in the parking lot where Price was known to park at her place of employment. It also stated that the Norwalk police had been in contact with the New York Police Department, which had reported that the burned-out car with the body in it was Price's. In addition, Stamford police had reported that a witness saw Price's vehicle exit the garage at her place of employment at approximately 8:50 a.m., the time when Price generally arrived at work. The witness stated that the car exited the garage at great speed, occupied by two persons, one described as "a heavy set black male." Another witness heard what he believed to have been a female scream at about the same time. A third witness reported seeing, at approximately 8:30 a.m., a midnight blue or black-colored Honda Prelude with dark tinted windows in the elevator area near where Price parked.

The affidavit also stated that Price had obtained a restraining order against Frank for family violence, and that Frank was a suspect in her death. It stated that Frank operated a Honda Accord similar to the car the third witness had seen in the garage. This witness was transported to Norwalk to view Frank's car, and confirmed that Frank's car was similar to the one that he/she had seen in the garage. The officers set forth their own observation that Frank's car has tinted windows.

Finally, the officers stated that it appeared, based on the location and condition of the burned-out car, that an accelerant had been used to create the fire and that the perpetrator would have had to leave the scene in a car. A search of Frank's car was therefore justified, according to the officers, because

> based on the affiants [sic] training and experience, a person or persons involved in the commission of a violent offense is in contact with physical surroundings in a forcible or otherwise detectable manner. . . . [T]races of evidence may be left and attempts may be made to destroy, alter, remove, cleanup, or cover up evidence of a crime. . . . [I]tems may be minute or microscopic and may require specialized examination by forensic laboratory techniques.

---

7. The facts set forth in this section are taken from the documentary evidence that was submitted in preparation for the hearing as well as the testimony of Officer Romano at the hearing. The circumstances of the search warrants' issuance were not contested at the hearing or in Frank's pre-hearing memorandum. The motion to suppress addressed to the search was based entirely on the contention that the March 14 warrant was not supported by probable cause.

The application for a warrant to search Frank's car was approved by an Assistant State Attorney with the Connecticut State Attorney's Office and was signed by a Superior Court judge on March 12, the day that Frank travelled by bus from New York to Florida.

On March 14, Cahill and a different member of the Stamford Police Department, Sergeant Ralph Romano (who did testify at the hearing) made a second application to Superior Court for a search warrant in their investigation of Price's death. This second application, which also was approved by the State Attorney's Office, sought a warrant to enter the home of Cynthia Greene, where Frank often stayed, to search for

> men's clothing that would be of the type worn by a male with the approximate height of 6'02" inches tall and weighing approximately 220 pounds including outergarments, shoes, socks, belts, undergarments, hats, shirts, sweatshirts, pants, and other clothing normally worn in the winter or cold weather months.

The March 14 affidavit set forth the same preliminary facts that were in the March 12 application, i.e., that a body had been found on March 11 in a burned-out car that was registered to Price; that Price had been reported missing that day; that she had taken out a restraining order against Frank; and that Price's mother feared for Price's safety because of prior violent actions by Frank. It further recounted that blood had been found in the garage near where Price generally parked, and that Price's car had been seen exiting the garage "operated by a stocky black male." The affidavit did not indicate that Frank is black, but described him as "6'2" tall and weighing in the area of 220 pounds." The affidavit set forth the same general statement that was contained in the March 12 affidavit about how microscopic traces of a violent crime are often left behind. Finally, the affidavit stated that Frank had been apprehended in Florida after news reports indicated that he might be a suspect in Price's death, and that

*while being interviewed in Florida, Frank stated on the date of the incident he had changed his clothing in the apartment of Cynthia Greene ....* That Deric Frank has been using this apartment as a place of residence. That Deric Frank has been identified as a suspect in this incident. That the affiants believe that clothing used in the course of the disappearance and/or of the burning of the auto may contain accelerants, blood, fibers, hair, soil samples, and/or other evidence connecting a suspect to the crime.

(Emphasis added). The March 14 application was approved on that date by the same judge who had reviewed and approved the March 12 search warrant. When presented with the March 14 affidavit, the judge explicitly asked the officers whether the March 14 application was connected to the March 12 warrant. He was told that both warrants concerned the same case.

### G. The March 24 Meeting at the Office of the United States Attorney

On March 24, a meeting was held at the Office of the United States Attorney for the Southern District of New York to discuss the Price case. The meeting was attended by Detective Romano of the Stamford Police Department, Lieutenant Joseph Cordes [8] and Detectives Fox, Bourges, and Michael Block [9] of the New York City Police Department, Special Agent David Burroughs of the New York City Office of the FBI, and Assistant United States Attorneys John Hillebrecht and Steve Cohen. At that March 24 meeting, it was essentially agreed, or at the very least understood, that Price's death would be prosecuted federally.

Prior to March 24, the federal involvement in the Price investigation was *de minimus.* All of the detectives from the New York City and Stamford Police Departments who testified at the hearing—including Romano, Cordes, Fox, Bourges, and Block—stated repeatedly that the investigation was local up until that point. In particular, the decisions

---

8. Cordes was the commanding officer of the 33 Precinct Detective Squad in New York. Fox and Bourges are both detectives with the 33 Precinct.

9. Block, also with the 33 Precinct, was the detective in charge of the Price case.

to interview Frank on March 13 and 14, and to obtain the two Connecticut search warrants, were made entirely by local New York and Connecticut law enforcement officials, without any consultation with any federal law enforcement officer or federal prosecutor. The only federal involvement consisted of the following actions. On March 13, Lieutenant Cordes contacted the United States Attorney's Office in the Southern District of New York to seek assistance. He explained his decision to do so as follows:

> At the point where we realized that there was a connection between Connecticut and New York, and then ultimately when Mr. Frank was arrested in Florida, I realized that there was [sic] three states involved and that there was the possibility that I would need the U.S. Attorney's office in regards to issuing subpoenas in three states or that type of situation.

Cordes explained that he had been involved in a narcotics investigation with the U.S. Attorney's Office in the prior year, and that initially he tried to contact the AUSA with whom he had worked on that case. Cordes did not call the U.S. Attorney's office directly, but went through the New York City Police sergeant with whom he had worked on the prior case. This sergeant worked on a joint local and federal Drug Enforcement Task Force, and continued to have contacts at the U.S. Attorney's Office. When Cordes was informed, through this sergeant, that the AUSA with whom he had previously worked was not available, he was referred to Steve

Cohen, the supervisor at the United States Attorney's Office who ultimately put Cordes in touch with AUSA Hillebrecht.

On March 14, Detective Block spoke on the telephone with Hillebrecht in order to obtain an Unlawful Flight to Avoid Prosecution ("UFAP") warrant so as to "make sure that Mr. Frank was held and get him back to New York as soon as possible." This UFAP warrant ultimately was not used because Frank waived extradition to New York. Hillebrecht or other members of the United States Attorney's Office did, however, assist Cordes and his team in obtaining subpoenas for phone records. Cordes explained that he asked the U.S. Attorney's Office for this assistance because, given that several states were involved, it was more expedient than going through the District Attorney's Office.

Also on March 14, Special Agent Burroughs received a telephone call from Assistant United States Attorney Steve Cohen regarding the Price investigation. Burroughs was given the names and phone numbers of AUSA Hillebrecht and Lieutenant Cordes. Cohen told Burroughs that there was no federal investigation at that time, but that Burroughs should contact Cordes to offer any assistance that he might need.[10] Burroughs did in fact contact Cordes to offer assistance on March 14, but Cordes did not take him up on the offer. Other than assisting with subpoenas to obtain telephone records, the first time that Burroughs participated in any part of the investigation was on March 26, 1997, when he, along with Detec-

---

**10.** Burroughs opened an FBI investigative case file for the Price matter on March 17 in order to facilitate work he performed to assist the police and to lay claim to the case in the event that federal charges were brought. As he explained at the hearing,

> it's easier to have an established file number ... assigned to that case to facilitate different administrative things we might need such as the request for money to do things or—there's a variety of administrative issues that if you have an active and open case in the file it just helps you to accomplish things a lot quicker.

Burroughs's testimony was clear that as of March 17, he still understood that the investigation was being conducted exclusively by local authorities. Nevertheless, the memorandum that Burroughs drafted to open the case includes the statement that AUSA Hillebrecht "intends to prosecute this matter as violation of Title 18,

USC, SEC 1958 (murder for hire)," a statutory section that Burroughs's squad was assigned to enforce. As was unequivocally clear from the hearing testimony, Burroughs inserted this phrase to ensure that he and his unit would be assigned to the case if it ever did become a federal investigation, instead of it being assigned to the "kidnapping" squad, to which he did not belong.

The Court finds that this memorandum was written in part to claim this investigation for Burroughs's squad in the event that at some later point it became a federal prosecution and a "turf battle" developed within the FBI regarding the assignment of the investigation. Specifically, the Court finds that neither Hillebrecht, nor any other federal prosecutor, nor the FBI had an understanding on March 17 that Frank would be prosecuted federally.

tives Fox and Romano, attended an interview conducted of Frank in Norwalk, just after Frank was arraigned on Connecticut charges. Because Burroughs had insufficient information at that point to play a meaningful role in the interview, he was essentially a passive observer. At the time of this interview, these officers expected that Frank would be indicted later that day by a federal grand jury, and they knew that Frank had an attorney in connection with the Connecticut charges. Frank was in fact indicted on federal charges later that day in New York.

## II. *DISCUSSION*

As with the recitation of the facts above, the Court will discuss Frank's various arguments in roughly chronological order, according to when the events in question occurred. There are five issues that must be addressed: (1) the extent of federal involvement in the Price investigation before March 14; (2) the validity of Frank's arrest; (3) the voluntariness of Frank's statements on March 13 and 14; (4) the validity of the March 14 search warrant; and (5) the appropriateness of the March 26 interview in the absence of Frank's lawyer.

### A. *The Extent of Federal Involvement*

Frank claims that there was considerable federal involvement in the investigation of Price's death in the two days between the crime and his arrest. Accordingly, Frank argues that the six-hour standard for presentment to a magistrate found in Section 3501 of Title 18, United States Code, which governs the admissibility of confessions in all federal prosecutions, should apply to his case. The upshot of this argument is that Frank claims that *all* of his statements should be suppressed on account of the more than six hour delay in presenting him to a magistrate.

It is true that defendants arrested on *federal* charges must be brought before a judicial officer without any unnecessary delay. Rule 5(a), Fed.R.Crim.P., provides in pertinent part:

> [A]n officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person *without unnecessary delay* before the nearest available federal magistrate judge or, if a federal magistrate judge is not reasonably available, before a state or local judicial officer authorized by 18 U.S.C. § 3401.

(Emphasis added.)

Section 3501 of Title 18, United States Code, governing the admissibility of confessions, requires that, in order to be admissible, a confession must not be the result of undue delay in a presentment. In relevant part this Section provides:

> In any criminal prosecution ... a confession ... shall be admissible in evidence if it is voluntarily given.... The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment .... *In any criminal prosecution by the United States ... a confession* made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law enforcement agency, *shall not be inadmissible solely because of delay in bringing such person before a magistrate ...* if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and *if such confession was made or given by such person within six hours immediately following his arrest* or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate ... beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

18 U.S.C. § 3501 (all but final emphasis added). Thus, while delay in a presentment

does not by itself require suppression of a confession made in response to interrogation, a delay of greater that six hours may by itself be a sufficient ground to suppress a statement unless the delay is found by the Court to be reasonable under the circumstances. *United States v. Perez,* 733 F.2d 1026, 1030 (2d Cir.1984). Where there has been a delay beyond six hours, a court should examine how the government agents used the time before a presentment, specifically, whether they employed coercive tactics to obtain a confession. *United States v. Rubio,* 709 F.2d 146, 153 (2d Cir.1983).

■■■ Section 3501 applies, however, only to prisoners arrested for *federal* crimes by any law enforcement agency, state or federal. *United States v. Alvarez–Sanchez,* 511 U.S. 350, 358, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). "The touchstone of determining the applicability of § 3501(c), therefore, is the governmental source of the charge underlying the arrest, not the law enforcement agency involved." *United States v. Fullwood,* 86 F.3d 27, 31 (2d Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 442, 136 L.Ed.2d 338 (1996).

■■■ In this case, Frank was not charged with a federal crime until March 26. Indeed, until March 24 the investigation was conducted and controlled exclusively by local law enforcement officers. Thus, for example, federal authorities were not even advised in advance that Frank would be interviewed on March 13 and 14, or that search warrants were being sought, obtained, or executed on March 12 and 14. Nevertheless, Frank claims that the investigation by Connecticut and New York police was a mere pretense orchestrated by federal authorities. Frank argues:

> Federal authorities were involved from the outset, the FBI having made the arrest and a federal arrest warrant having issued from the Southern District of New York on March 14, 1997. Although Mr. Frank's arrest was formally based on a pending Connecticut misdemeanor charge for criminal trespass, that was just a pretense. Mr. Frank was repeatedly advised that the United States government wanted to prosecute him for homicide. The real purpose

of his arrest was to make him answerable to federal crimes.

The record plainly refutes these claims.

First, there is no support for the contention that federal authorities were involved from the outset. Instead, the evidence is clear that the investigation of Price's murder was initiated, supervised, and conducted in its beginning phases by local police detectives. A police Lieutenant decided to contact the United States Attorney's Office solely to obtain logistical support for the detectives working under him because the investigation involved more than one state. Federal authorities were apprised only after the fact of the progress in the investigation, and as noted, it was not until March 24 that federal authorities actually assumed control of the investigation.

Second, insofar as the events in Florida are concerned, the FBI's role was two-fold. An FBI night-duty agent received the "tip" from Frank's aunt that Frank would arrive in Florida by bus that morning. In addition, FBI agents were part of the multi-jurisdictional Task Force that effected Frank's arrest. The fact remains, however, that Frank was arrested not by the FBI, but by the Task Force, and specifically by a Florida police officer, Detective Dittman, in connection with the *Connecticut* warrant. The March 14 federal arrest warrant, to which Frank refers as a "UFAP" warrant, was never executed and, in any event, would merely have provided a mechanism to facilitate Frank's extradition to Connecticut to face state charges.

Third, there is absolutely no support for the claim that Frank was repeatedly told that he would be prosecuted federally. Frank's affidavit indicates only that the detectives told him at some point on March 13 that the United States Government "was interested" in the investigation. But all of the detectives who interviewed Frank testified to the fact that, until March 24, they had no understanding or belief that there would be a federal prosecution. Moreover, the Court finds that the detectives did not say anything

to Frank that would have suggested that a federal prosecution was imminent.[11]

■ In sum, Frank plainly fails to meet his burden of "demonstrat[ing] the existence of improper collaboration between federal and state or local officers," which would be necessary to trigger Section 3501's application to a local arrest. *Alvarez–Sanchez,* 511 U.S. at 359, 114 S.Ct. 1599. Because Frank had not been charged with a federal offense at the time that he was held in custody in Florida, his effort to invoke Section 3501 as a basis for the suppression of his statements must fail.[12]

B. *The Lawfulness of the Florida Arrest* .

Next, Frank contends that his statements should be suppressed because his arrest was unlawful. This portion of his argument has two components. First, Frank claims that his arrest on the Connecticut misdemeanor warrant was illegal under Florida law because the arresting officers did not first obtain a warrant from a Florida court. This argument was raised at the very end of the hearing, after the close of evidence. Second, Frank claims that, even if the arresting officers had complied with Florida law, the arrest would have been illegal because the Connecticut warrant was not supported by probable cause. This argument was not raised *at all* at the suppression hearing and appeared for the first time in Frank's post-hearing briefs. Both of these arguments are meritless.

1. The Requirements of Florida Law

Frank claims that his arrest was illegal because it was made

in violation of the Uniform Criminal Extradition Act, as adopted by Florida and numerous other states. *See* Fla. Stat. Ann. §§ 941.13 and 941.14 (the "Extradition Act"). Specifically, the Extradition Act, as enacted in Florida, prohibits arrests for out-of-state misdemeanors unless a Florida warrant for the arrest has been obtained.

Frank argues that, under the Florida Extradition Act, police officers may not arrest a fugitive from another state on a *misdemeanor* warrant until they have obtained a warrant from a Florida court.

■ Assuming for purposes of this analysis that Frank's arrest violated the Florida Extradition Act, that fact would not be determinative of his motion. Frank seeks suppression of his statements on the ground that they were the fruit of an illegal arrest.[13] Whether an arrest was illegal such that any statements derived from it must be suppressed in a federal prosecution, however, turns not on whether the arrest violated any provision of state law, but on whether it violated the requisites of the Fourth Amendment. *See California v. Greenwood,* 486 U.S. 35, 43, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); *Cooper v. California,* 386 U.S. 58, 61, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). *See also United States v. Workman,* 80 F.3d 688, 694–95 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 319, 136 L.Ed.2d 233 (1996); *United States v. Smith,* 9 F.3d 1007, 1014 (2d Cir. 1993).

■ The touchstone for all Fourth Amendment inquiries is "reasonableness." *Whren v. United States,* 517 U.S. 806, 116 S.Ct.

---

**11.** Even if the New York detectives had cause to believe that Frank also had violated federal law, that fact would not change the Court's analysis. *Alvarez–Sanchez,* 511 U.S. at 358, 114 S.Ct. 1599.

**12.** Although it is unnecessary, the Court finds based on the record that the delay in Frank's presentment to a magistrate judge—between his arrest on March 13 and his presentment on March 15—was not unreasonable. As noted, a 48 hour span of time between arrest and presentment is not unusual in Broward County, and there was no evidence of any purposeful activity by a law enforcement officer to delay Frank's presentment.

**13.** Frank does not set forth the full parameters of his "fruits of the illegal arrest" argument. His post-hearing brief states simply:

> This brief does not undertake to enumerate all the fruits of the illegal arrest. Further inquiry will be necessary to determine the precise ramifications of a ruling that the arrest was illegal.

As set forth above, the Court does not find that Frank's arrest was illegal. Since Frank has not "enumerated all the fruits of the illegal arrest," the Court will not undertake to set forth a responsive analysis of how, even if the arrest was illegal, the taint might have been sufficiently attenuated as to permit the admission of his statements and any other "fruits."

1769, 1776, 135 L.Ed.2d 89 (1996). Although the question whether an arrest was authorized by a state's extradition law may be one indication of reasonableness, it is by no means dispositive. The cases cited by Frank are not to the contrary. Indeed, in the primary case relied upon by Frank, *United States v. Mota*, 982 F.2d 1384 (9th Cir.1993), the Ninth Circuit held only that state law was relevant in determining the legality of a search following an arrest. *Id.* at 1387–89. *Mota* therefore is of little assistance to Frank, who challenges the legality of his arrest rather than a search incident to arrest. In any event, *Mota* is in direct conflict with Supreme Court and Second Circuit holdings, *see Greenwood*, 486 U.S. at 43, 108 S.Ct. 1625, *Workman*, 80 F.3d at 694; was directly questioned in the concurring opinion filed with it, *see* 982 F.2d at 1389 (Fernandez, J. concurring); has essentially been limited by Ninth Circuit courts to its facts, *see, e.g., United States v. Velarde*, 823 F.Supp. 792 (D.Haw.1993), *aff'd*, 25 F.3d 848 (9th Cir. 1994); and is the subject of criticism by scholars. *See* 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 1.5(b), at 140–41 (1996).

 Thus, even if Frank's arrest did violate the Florida Extradition Act, the Court would · determine its reasonableness according to federal constitutional standards. The Court finds no support for Frank's argument that an arrest on an out-of-state misdemeanor warrant without more violates the Fourth Amendment.[14] To the contrary, arresting an individual in reliance on the existence of a warrant for that person's arrest issued by a judicial officer (even one from a different state) is inherently reasonable. Indeed, on the facts of this case, there can be no doubt that the Florida police would have obtained a Florida warrant for Frank's arrest had they applied for one to a Florida magistrate. *See, e.g., Michigan v. Doran*, 439 U.S. 282, 290, 99 S.Ct. 530, 58 L.Ed.2d 521 (1978) (Blackmun, J. concurring) (pursuant to the Extradition Clause of the Constitution, an asylum state is without power to

review another state's determination of probable cause); Fla. Stat. Ann. § 941.13 (providing that the magistrate has no discretion to deny the warrant when presented with the "oath of any credible person" that a person has been charged with a crime in another state); Fla. Op. Atty. Gen., 055–70 (March 25, 1955) (a justice of the peace must issue a fugitive warrant if presented with an out-of-state misdemeanor warrant). Where the sole deficiency in an arrest arises out of failure to comply with a mere technicality in state law, *see Scott v. District of Columbia*, 101 F.3d 748, 754 (D.C.Cir.1996) (characterizing the warrant requirement for a misdemeanor arrest, which Florida retains, as a technicality), *cert. denied*, —— U.S. ——, 117 S.Ct. 1824, 137 L.Ed.2d 1031 (1997), it is implausible that the arrest was unreasonable and that the deficiency resulted in a constitutional violation.

2. The Validity of the Connecticut Warrant

 Frank's second argument with respect to his arrest is that, even if the detectives were not required to obtain a Florida warrant, the arrest nevertheless was illegal because the Connecticut warrant on which they relied was defective. According to Frank, the Connecticut warrant was unsupported by probable cause, and, moreover, was so deficient that the Florida detectives could not have relied upon it in good faith.

Neither the warrant nor the affidavit and Application on which it was predicated, each of which were signed by a Connecticut judge, identify any particular statute as the basis for the warrant. As described above, however, Officer Morin's affidavit set forth enough facts to establish, at a minimum, probable cause that Frank had violated the February 21 order of protection. That order explicitly prohibited Frank from "threatening" or "harassing" Price. The allegations in Morin's affidavit manifestly demonstrated that Frank had threatened and harassed Price by, among other things, following her to her house and instilling such fear in her that she

---

**14.** Here, a warrant had been issued for Frank's arrest in Connecticut, so the Court need not decide whether a misdemeanor arrest based on no warrant at all would violate the Fourth Amendment.

would run into her residence and lock the doors. The affidavit also repeated Morin's warning to Frank that "if he didn't come to headquarters and speak to this officer . . . a[sic] arrest warrant would be filed against him for violation of the restraining order." This Court finds on the basis of this evidence that the warrant was amply supported by probable cause.

Frank nevertheless argues that the warrant was defective because the affidavit on which it was based failed to set forth all of the elements of criminal trespass, the offense listed by the police on the "Information" sheet that was submitted along with the affidavit and Application to the Connecticut judge who signed the arrest warrant. According to Frank, because criminal trespass includes "enter[ing] or remain[ing] in a building," the affidavit should have contained an allegation that Frank entered or remained in a building.

 The Court cannot find that it was necessary for the affidavit to state probable cause for a criminal trespass charge simply because that offense was listed by the police on an "Information" sheet that accompanied the Application for the arrest warrant—especially since the Information does not contain the signature of the Connecticut judge or any indication that it was adopted or relied upon by him. In any event, when given the "common sense and realistic" reading to which it is entitled, *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Hillard*, 701 F.2d 1052, 1062 (2d Cir.1983), the affidavit does supply sufficient facts to support a finding of probable cause to believe that Frank had violated Connecticut's criminal trespass statute, which provides in full:

A person is guilty of criminal trespass in the first degree when: (1) Knowing that he is not licensed or privileged to do so, he *enters or remains in a building or any other premises* after an order to leave or

not to enter personally communicated to him by the owner of the premises or other authorized person, or (2) he *enters or remains in a building or any other premises* in violation of a restraining order issued pursuant to section 46b–15 or a protective order issued pursuant to 46b–38c or 54–11 by the Superior Court.

Conn. Gen. St. § 53a–107 (emphasis added).

 Frank focuses on the word "building" to the exclusion of the phrase "or any other premises." But this myopic reading of the statute affords him no relief. The common sense meaning of the word "premises" is that it includes land adjacent to a building. Indeed, if "premises" were simply another word for "building," it would not have been included in the statute. Connecticut trespass law considers "premises" to be not merely another word for "building," but to apply as well to open fields or "lawn." Conn. Stat. Ann. § 53a–109, Commission Comment (West 1994). Although Frank (apparently) never succeeded in gaining entry to Price's home during the period in question, the affidavit makes clear that he attempted to do so. While it could have been more explicit in describing Frank's physical encroachment on the premises, Morin's affidavit, when given the common sense reading to which it is entitled, sets forth sufficient allegations to establish probable cause to believe that Frank entered and remained on the premises of Price's home in violation of Section 53a–109.[15]

C. *The Voluntariness of Frank's Statements on March 13 and 14*

 Frank argues that his statements to the New York detectives on March 13 and 14 should be suppressed because they were obtained in violation of his Fifth Amendment rights. According to Frank,

all of the circumstances indicate that Mr. Frank did not voluntarily, knowingly or

15. The affidavit also sets forth sufficient facts to support an arrest for stalking as well as harassment. Because the Court finds that there was probable cause to issue the warrant on the charge that Frank violated the order of protection, however, the Court need not reach these additional issues. Similarly, in light of the con-

clusion that the arrest based on the warrant issued for Frank's violation of the protection order is lawful, the Court need not address the Government's discussion of the other warrant that was outstanding at the time of Frank's arrest, for his failure to appear in court on a narcotics charge.

intelligently waive his Fifth Amendment rights. He executed waivers while suffering from extreme fatigue and after having been misled by the police to believe that he had no right to contact a lawyer. Having never previously been charged with a violent crime or spent a night in jail, he lacked experience with the criminal justice system, and his will was overborne.

This argument is unpersuasive.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court determined that, before undergoing an in-custody interrogation, an "accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Id.* at 467, 86 S.Ct. 1602. Accordingly, prior to conducting a custodial interrogation, the Government must inform a defendant of

> the [Government's] intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present ... if [he] so desires."

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (quoting *Miranda*, 384 U.S. at 468–70, 86 S.Ct. 1602) (alterations in original). Once an accused is apprised of these rights, he may waive them "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602; *Moran*, 475 U.S. at 421, 106 S.Ct. 1135 (quoting *Miranda*). When a defendant has made a statement to the Government, and then objects to the introduction of the statement at trial based on a violation of *Miranda*, the Government has the burden of proving by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of the rights enunciated in *Miranda*. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 140, 136 L.Ed.2d 87 (1996).

For a waiver to be "voluntary," the waiver must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421, 106 S.Ct. 1135. Resolution of this issue requires inquiry into "the totality of all the surrounding circumstances," *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), including a defendant's background and experience, the conditions of the interrogation, and the conduct of the officers. *Diaz v. Senkowski*, 76 F.3d 61, 65 (2d Cir.1996); *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995).

For a waiver to be made "knowingly and intelligently," a defendant must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421, 106 S.Ct. 1135. In order to meet this test, however, the accused need not "know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). Rather, the accused need only be aware that "he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.; accord Oregon v. Elstad*, 470 U.S. 298, 316, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (noting that "[t]he Court has never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness").

Significantly, the waiver of rights need not be explicit. In *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), the Court held that

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case.

Thus, a defendant can be found to have waived the right to counsel despite refusing to sign a waiver form. *United States v. Spencer*, 995 F.2d 10, 12 (2d Cir.1993).

Here, Frank waived his rights explicitly and repeatedly. The record reveals that Frank was read his Miranda rights, and

waived them, at least three times: first, at the bus station when he was arrested; second, on March 13 at 1:15 p.m. when the New York Detectives first initiated their interview at the Fort Lauderdale city jail; and third, on March 14 at 12:20 p.m. when the detectives continued their interview at the Broward County jail. The latter two times—which are the critical ones for purposes of Frank's motion—Frank waived his rights in writing as well as orally.

There simply is no support for Frank's claim that his statements were made involuntarily. Detectives Bourges and Fox did not threaten Frank in any way, physically or psychologically, nor deprive him of food or drink. There is no evidence to suggest, as Frank alleges, that the detectives told him that he had no right to contact a lawyer. To the contrary, each time he was advised of his rights, Frank was told explicitly that he could remain silent and that he had a right to counsel. There also is no credible evidence that Frank asked to make a telephone call to contact a lawyer.[16] Moreover, notwithstanding the representations in his brief, Frank has had extensive experience with the criminal justice system. Thus it is implausible that a night in jail would have caused his will to be overborne.[17] Finally, there has been no contention that Frank does not understand English, has such a low level of education or intelligence that he could not comprehend his rights, or was under the influence of drugs or alcohol.

Frank's argument that his will was overborne thus depends entirely on his alleged "lack of sleep, his evident emotional state, and the length of his interrogation." The Court finds this self-serving description of Frank's condition and the circumstances of his interview insufficient to secure him the relief he seeks. The Court does not find that the interview, punctuated as it was by breaks amounting to several hours, was so long as to be unreasonable. Every witness who testified at the hearing observed that Frank was alert and coherent during the interview; and Detective Fox and Bourges—who had themselves been awake for roughly the same number of hours as Frank—testified that Frank had no difficulty resuming the interviews after the breaks. Every witness also described Frank as eager to talk and to cast blame elsewhere for Price's death. Indeed, Frank was sufficiently awake and in control of his faculties to compose with the detectives a 13-page written statement containing his alibi for the day of Price's death.

That Frank was emotional during certain portions of the interview does not necessitate a finding that his will was overborne. The inquiry remains the same: was Frank capable of knowingly, intelligently, and voluntarily waiving his rights. Because the Court finds that Frank did knowingly, intelligently, and voluntarily waive his rights, his statements made on March 13 and 14 will not be suppressed.

### D. The Validity of the March 14 Search Warrant

Frank seeks to suppress evidence found in the home of Cynthia Greene, including sneakers that have been shown through laboratory tests to contain traces of gasoline and soil matching that at the crime scene, on two bases. First, Frank relies on the "fruit of the poisonous tree" doctrine and argues that the evidence should be suppressed because the police were led to it by Frank's "involuntary" statements on March 13. Because the Court finds that the March 13 statements were made voluntarily, the Court need not address this argument. Second, Frank claims that the March 14 warrant lacked

---

16. Frank claims in his affidavit that he did make a request for a phone call, and did explain that he needed to make that call to "get in touch with a lawyer." If Frank did make an unambiguous request for counsel at any time during the interview, then the interview should have ceased until an attorney was made available or until Frank reinitiated the conversation. *Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *Diaz v. Senkowski*, 76 F.3d 61, 64–65 (2d Cir.1996). The Court finds in light of the credible and uncontradicted testimony at the hearing, however, that Frank never made such a request for counsel during the March 13 and 14 interrogations.

17. In any event, this argument presumably would apply only to the March 14 statements, since on March 13, Frank had not yet spent a night in jail.

probable cause. According to Frank, the affidavit relied largely on Frank's reputation and history of domestic violence, and contained insufficient independent facts linking him to Price's death. Moreover, Frank claims that the warrant was so defective that the officers were not entitled to rely upon it in good faith. These arguments are unavailing.

The Court's review of a magistrate's determination that probable cause existed begins with the proposition that the magistrate's finding of probable cause is entitled to "great deference." *Smith,* 9 F.3d at 1012 (quoting *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). The magistrate's finding that there was probable cause is itself "a substantial factor tending to uphold the validity of [the] warrant." *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983). The reviewing court need not review *de novo* the papers submitted to the magistrate, *id.,* but must instead determine whether the magistrate "performed his neutral and detached function on the facts before him, and did not merely serve as a rubber stamp for conclusions drawn by the police." *Id.*

Because applications for a search warrant are often drafted in the haste of a criminal investigation, the application "should be read practically and in a commonsense fashion." *Id.* at 346 (citing *Ventresca,* 380 U.S. at 108, 85 S.Ct. 741). "[I]t is only a probability, and not a prima facie showing of criminal activity that is the standard of probable cause." *Id.* Where there is a "fair probability that the premises will yield the objects specified in the search warrant," the standard of probable cause is satisfied. *Id.* See also *United States v. Cancelmo,* 64 F.3d 804, 808 (2d Cir.1995) ("a search warrant is properly issued if a neutral magistrate finds that, *under the totality of the circumstances,* probable cause exists to believe that a crime has been committed") (emphasis added).

The Court finds in this case that the March 14 affidavit set forth sufficient facts to allow the magistrate to find probable cause that Cynthia Greene's home would yield the evidence to which the officers referred in their affidavit. As described above, the affidavit set forth the preliminary facts about the crime and chronicled Frank's abuse of Price and Price's resort to a restraining order. It referred as well to the eyewitness description of the individual seen driving Price's car out of the garage on March 11, and presented facts about Frank's physical characteristics that matched those in the description. Finally, the affidavit mentioned the fact that Frank had fled to Florida, and it provided facts linking Frank to Cynthia Greene's home.

On the basis of these facts, the magistrate could reasonably have determined that Frank was involved in Price's death and that the designated premises would yield evidence of the crime. That determination would not have rested, as Frank argues, solely on his reputation and history, but would have been based upon independent facts concerning Frank's whereabouts and actions on the day of the crime and immediately thereafter. While Frank places great reliance on an alleged inconsistency between the eyewitness's description of the man seen driving Price's car and the description of Frank set forth in the affidavit, the Court finds any potential discrepancy to be insufficient to justify a conclusion that the warrant lacked probable cause. Although Frank may not be "stocky" in the sense of being "short"—a characteristic the former term is sometimes defined to include—he certainly is "stocky" in the sense of being "solidly built" or "sturdy." *Webster's II, New Riverside University Dictionary* (1994). More to the point, however, the affidavit also described Frank's height and weight so that the judicial officer reviewing the affidavit could assess the accuracy and relevance of the eyewitness testimony. Finally, setting the physical description aside, the Court finds in any event that the affidavit, viewed in its totality, placed sufficient facts before the magistrate as to allow him reasonably to conclude that probable cause existed.

Even if the affidavit were deficient, however, the Court finds that the "good faith" exception to the exclusionary rule articulated in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984),

would allow the evidence to be admitted. As the Second Circuit has explained,

> Evidence seized pursuant to a warrant for which actual probable cause does not exist or which is technically deficient is admissible if the executing officers relied on the warrant in "objective good faith." *Leon,* 468 U.S. at 923, 104 S.Ct. 3405 (test of objective good faith is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization"). The essential rationale underlying the good faith exception is that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Id.* at 919, 104 S.Ct. 3405.

*Cancelmo,* 64 F.3d at 807. *See also United States v. Reilly,* 76 F.3d 1271, 1280 (2d Cir. 1996) ("For the good faith exception to apply, the police must reasonably believe that the warrant was based on a valid application of the law to the known facts.").

 Given that the same police officers who applied for the March 14 affidavit had also applied on March 12—before the same magistrate—for a warrant to search Frank's car, the Court finds that the contents of the March 12 affidavit must factor into any good faith analysis. That affidavit, as discussed above, contained even more information linking Frank to the crime. For example, it placed a car resembling the one driven by Frank at the scene of Price's abduction. It also included a description of the driver of Price's car that did not contain the word "stocky," but described that person only as a "heavy set black male." Accordingly, the Court finds that the police officers had suffi-

cient information—all of which they communicated to the magistrate, albeit some of it orally on March 14 [18]—to support an objectively reasonable determination that their search was legal, even if the March 14 affidavit technically was deficient.[19]

### E. Admissibility of the March 26 Statements

Finally, Frank claims that the statements he made during police interviews in Norwalk on March 26 must be suppressed because they were made without his counsel being present, yet after his Sixth Amendment rights had attached. This argument must be rejected as well.

 It is of course well settled that, unless initiating the communication himself, a defendant may not be questioned without counsel present regarding a crime for which he has been indicted. *See Michigan v. Jackson,* 475 U.S. 625, 631–33, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *United States v. Gouveia,* 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984); *Brewer v. Williams,* 430 U.S. 387, 400–01, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). Where as here a defendant in custody on a state charge has not yet been charged with a federal crime, the defendant's Sixth Amendment rights have not attached with respect to the federal crime. Accordingly, there is no constitutional bar to interrogation concerning the federal crime outside the presence of counsel. *See Alexander v. State of Connecticut,* 917 F.2d 747, 751 n. 1 (2d Cir.1990) (no Sixth Amendment violation where suspect arrested on arson charges was interrogated without counsel about uncharged homicide). The Sixth Amendment

---

**18.** It is undisputed that the police officers had a colloquy with the magistrate on March 14 in which they confirmed that the warrant sought on that date related to the same case as the warrant that the magistrate had approved on March 12.

**19.** The Government cites numerous cases from other circuits that it believes establish "a consensus that facts not included in the four corners of the affidavit can be considered as part of the 'good faith' analysis, at least in the situation where these additional facts are communicated to the magistrate in some fashion or are otherwise connected to the 'warrant process.'" *Government's Omnibus Memorandum of Law in Opposition to Defendant's Pre–Trial Motions* at 131.

The Court agrees with this proposition as a clarification of what a court may consider in undertaking a good faith analysis. Where, as here, police officers have information linking the subject of a search warrant to a crime and have set forth that information in a prior affidavit prepared close in time to the allegedly deficient affidavit, and have submitted both affidavits to the same magistrate, it is reasonable to treat the prior affidavit as though it were incorporated by reference into the later affidavit for purposes of determining whether the officers reasonably could have believed that the later warrant was supported by probable cause.

right is "offense specific" and "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced." *McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). *See also United States v. DeVillio,* 983 F.2d 1185, 1191 (2d Cir.1993).

Frank contends, however, that his Sixth Amendment rights had attached with respect to any federal prosecution for Price's homicide by the time of the March 26 interview because, concurrently with that interview, federal prosecutors were appearing before the Grand Jury in New York to seek Frank's indictment. Frank raised this argument for the first time after the hearing. Indeed, in his pre-hearing memorandum in support of this motion to suppress, Frank had argued only that his Sixth Amendment rights were violated because the March 26 interview occurred after he had already been assigned counsel on the Connecticut charges. After the hearing, however, Frank shifted his argument to contend that his rights were violated through the prosecutor "acting to evade the requirements of the Sixth Amendment" by "manipulat[ing] the timing of the return of the indictment" so that it occurred after the March 26 interrogation. In pressing this claim, Frank also relies on a construction of the word "at" in the Supreme Court's decision in *Gouveia,* 467 U.S. at 187, 104 S.Ct. 2292 (Sixth Amendment right to counsel attaches "at … the initiation of formal proceedings"), to support the argument that his Sixth Amendment rights had attached. Based on the assertion that the Government is guilty of bad faith, Frank contends that the government may not rely on the fact that he had not yet been formally charged as grounds for admitting his statements. Both of these arguments are meritless.

■■■ First, Frank's suggestion that the word "at" in *Gouveia* should be construed as providing that Sixth Amendment rights attach while the Government is making, or is about to make, a presentation to the Grand Jury, is unpersuasive. In the area of criminal procedure, bright line rules are necessary to give guidance to law enforcement authorities. *See Elstad,* 470 U.S. at 359, 105 S.Ct. 1285 (Brennan, J., dissenting) ("The whole

point of the Court's work in [the area of constitutional criminal procedure] has been to prescribe 'bright line' rules to give clear guidance to the authorities."). The construction of the Sixth Amendment advanced by Frank would invite utter chaos into the activities of law enforcement personnel, who would be left to guess at what point a contemplated prosecution had developed such that the Government was "at" the initiation of formal proceedings. As the Court in *Gouveia* explained, its conclusion that the Sixth Amendment right to counsel

> attaches at the initiation of adversary judicial criminal proceedings is far from a mere formalism. It is only at that time that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.

467 U.S. at 189, 104 S.Ct. 2292 (internal quotations omitted).

■■■ Second, there is no evidence that the Government acted in bad faith in its timing of Frank's indictment on federal charges. This is not a case where the authorities held a defendant in custody for a prolonged period of time on selected charges in the hopes that he would talk about other, uncharged offenses. Here, the federal authorities determined to prosecute Frank federally at the earliest on March 24. They presented their case to the Grand Jury just two days later, on March 26. Frank's conclusory allegation that AUSA Hillebrecht timed his presentation to the jury "to ensure that the grand jury did not act too quickly, before the interrogation was completed" is insufficient to suggest that the Government "knowingly circumvent[ed] the accused's right to have counsel present in a confrontation between the accused and a state agent." *Maine v. Moulton,* 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). Accordingly, the Court finds that Frank's Sixth Amendment rights had not yet attached at the time of the March 26 interview. His statements made on that date therefore will not be suppressed.

### III. *CONCLUSION*

For the reasons set forth above, the Court denies in their entirety Frank's motions to suppress his statements and the evidence obtained pursuant to the March 14 search warrant. The Court finds that Rule 5(a), Fed.R.Civ.P., and Section 3501 of Title 18, United States Code, are inapplicable to any analysis of Frank's March 13 and 14 statements, since Frank had not yet been charged with a federal offense at that time. The Court also finds that Frank's statements on March 13 and 14 were made voluntarily, and that his arrest in Florida on the Connecticut warrant was consistent with the Fourth Amendment. The Court finds that the Connecticut arrest warrant was supported by probable cause, as was the March 14 search warrant. Finally, the Court finds that Frank's Sixth Amendment rights had not yet attached with respect to his federal prosecution at the time of the March 26 interview, and that his statements on that date therefore are admissible.

SO ORDERED.