UNITED STATES of America,

v.

Wendell WALTERS, et al., Defendants.

No. 11 CR 683(NG)(RML).

United States District Court,
E.D. New York.

Oct. 16, 2013.

Anthony M. Capozzolo, Cristina Marie Posa, United States Attorneys Office, Brooklyn, NY, for Plaintiff.

Robert Anthony Evans, Jr., Law Office of R.A. Evans Jr., Maurice H. Sercarz, Diane Ferrone, Sercarz & Riopelle, LLP, Gerald J. Dichiara, Law Offices of Gerald J. Dichiara, Bruce Loren Wenger, Wenger & Arlin Esqs LLP, Howard R. Leader, Michael Beys, New York, NY, Michael K. Schneider, Federal Defenders of New York, Inc., Brooklyn, NY, for Defendants.

### *OPINION & ORDER*

GERSHON, District Judge:

By this motion, defendant Stevenson Dunn ("Dunn") seeks to suppress certain statements he made following his arrest in connection with his alleged participation in a kickback scheme involving the New York

City Department of Housing Preservation and Development. Dunn argues that he made the statements at issue without having been properly advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and with respect to some of the statements, that he expressly requested legal counsel, which request was not honored.

For the reasons set forth below, Dunn's motion is granted in part and denied in part.

## I. Background

According to the Indictment,[1] between 2005 and 2011, the New York City Department of Housing Preservation and Development ("HPD") administered various programs intended to develop affordable housing. (Ind. ¶¶ 2, 13.) In connection with these programs, HPD selected real estate developers, or "sponsors," who would then, with HPD, select general contractors to manage the construction and other work the projects required. (*Id.* ¶ 3.) One such developer selected by HPD was defendant Dunn, whose corporate entities included SML Development LLC, SML Bed Stuy Development, LLC, and Hancock Street SML LLC (collectively, the "SML Entities"). (*Id.* ¶ 7.) Defendants Lee Hymowitz ("Hymowitz") and Michael Freeman ("Freeman" or "Mike Freeman") were partners, with Dunn, in the SML Entities, and, separately, in the law firm of Hymowitz & Freeman.[2] (*Id.*)

The government alleges that Dunn, Hymowitz and Freeman solicited and received kickback payments from certain general contractors in exchange for awarding work in connection with various HPD projects and that the three defendants engaged in wire fraud and money laundering to conceal the nature of the kickback payments. (*See id.* ¶ 13.) Specifically, the government alleges that Dunn, Hymowitz and Freeman included the amounts of the kickback payments in requisitions submitted to HPD, "thereby passing on the costs of their own corrupt activity to HPD," and that they further concealed the nature of the kickback payments they received by providing to John Doe # 1 (a general contractor) a phony retainer agreement for legal services, and providing to both John Doe # 1 and John Doe # 2 (another general contractor) "false and inflated invoices" for certain services and supplies. (*Id.* ¶ 13.) The Indictment also contains allegations against Dunn of racketeering, extortion and bribery, as the government alleges that Dunn threatened John Doe # 2 and his family with violence when John Doe # 2 failed to make some of the kickback payments, and further, that Dunn made a cash bribe payment to John Doe # 3. (*Id.*)

Following his arrest in connection with these charges on October 5, 2011, Dunn made a series of inculpatory statements. By this motion, Dunn seeks to suppress the statements on the basis that they were obtained in violation of his rights under *Miranda*, and under the Fifth and Fourteenth Amendments.[3]

1. Superseding Indictment, filed August 29, 2012, ECF Document # 98.

2. Defendants Hymowitz and Freeman, who were also implicated by Dunn's statements, moved for redactions in accordance with *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and its progeny. By the same motion, Hymowitz and Freeman

also sought to dismiss the charges against them. By Order dated July 1, 2013 (ECF Document # 147), Hymowitz and Freeman's motion was granted with respect to the redactions and denied with respect to dismissal. *See United States v. Walters*, 963 F.Supp.2d 125, 2013 WL 4535904 (E.D.N.Y., July 2, 2013).

## A. Dunn's Motion and Supporting Affidavits

In his initial motion papers and accompanying affidavit, filed December 14, 2012, Dunn argued that his post-arrest statements are inadmissible because he was never advised of his rights against self-incrimination as required by *Miranda,* and that his requests to speak to an attorney were refused. He asserted that he was not given his *Miranda* warnings at the time of his arrest, nor while in transit from the location of the arrest, nor at any time during the course of his post-arrest interview in Manhattan. (*See* Dunn Aff.[4] ¶¶ 12, 17, 20.) While in the interview room, Dunn avers that he was shown a form, which he believed to be a criminal indictment bearing his name as a defendant, and:

> Once I was shown this document, I immediately stated to Agent Richards and the others that I wanted to talk to my attorney. I said this clearly and without equivocation.
>
> Agent Richards responded that I didn't have an attorney because he was also being arrested. I was immediately asked again about some alleged scheme I concocted or assisted in concocting with real estate developers.... They told me that I was also implicated in these activities and was in serious trouble. At this time I *again* asked to

speak to my attorney but was again rebuffed.

> I specifically stated that if Lee Hymowitz was not available that I be allowed to call Mr. Tarik Davis.... I was not allowed to call Mr. Davis, and the questioning in that room did not stop.... I was questioned for approximately another 5–6 hours in that room.
>
> I could not eat because eating would cause my blood sugar to spike and I did not have my insulin to control it.
>
> I was afraid in that room. I was afraid that my blood sugar would drop and I would go into diabetic shock. After having been held for many hours since having been grabbed out of a car at dinner time, I felt I had to give the agents something, anything to let me go.

(*Id.* ¶¶ 21–27, emphasis in original.)

In his moving papers, Dunn argued that there was no evidence that he had been given his *Miranda* rights, as there was "no form acknowledging and understanding the *Miranda* warnings or any form, for that matter, signed by Mr. Dunn." (Mem. in Supp.[5] 9.) Furthermore, Dunn argued that, to the extent he might have waived his rights, such waiver was the product of coercion and therefore not voluntary.

In connection with its opposition papers, filed January 14, 2013, the government submitted a copy of the FD–395 form (the "Advice of Rights Form"), dated October 5, 2011 and bearing the signature of Stevenson Dunn. (*See* Mem. in Opp.,[6] Ex. 1.)

---

**3.** Dunn makes a conclusory assertion that his Sixth Amendment right to counsel has also been violated. The Sixth Amendment right to counsel, however, attaches only after the initiation of adversary judicial proceedings and so is not implicated here. *See, e.g., Moran v. Burbine,* 475 U.S. 412, 429–30, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

**4.** Affidavit of Defendant Stevenson Dunn, December 14, 2012, ECF Document # 117–1.

**5.** Defendant Stevenson Dunn's Memorandum of Law in Support of His Motion to Suppress Custodial Statements Taken in Direct Violation of His Constitutional Rights and Privileges and Request for Hearing on Same, December 14, 2012, ECF Document # 117–2.

**6.** Government's Memorandum of Law in Opposition to Defendants' Pretrial Motions, January 14, 2013, ECF Document # 125. The Advice of Rights Form sets forth a list of the

The government argued that the existence of this form is "dispositive" on the issue of whether or not Dunn received—and waived—his *Miranda* rights. (Mem. in Opp. 25.) The government further argued that this form, along with the arrest log (*id.*, Ex. 2.), contradicts many of the assertions contained in Dunn's affidavit, thereby rendering an evidentiary hearing unnecessary. (*See id.* at 37.)

Dunn did not submit any papers in reply to the government's opposition, but following oral argument on the motion to suppress, submitted a supplemental affidavit, in which he avers, again, that he was not given his *Miranda* rights, nor was he given access to the medication he requested. (Dunn Supp. Aff.[7] ¶¶ 8–9.) He further states, "I have no recollection of writing a statement, signing a statement or any waiver of my rights," and reasserts his request for an evidentiary hearing. (*Id.* ¶¶ 14–15.)

## B. The Evidentiary Hearing

On May 20, 2013, an evidentiary hearing was conducted. The government offered the testimony of Special Agent Nashaun Richards ("Agent Richards") of the Federal Bureau of Investigation (the "FBI"). Dunn elected not to testify, and the de-

fense offered no other witnesses on his behalf.

Agent Richards testified that, at around 8:00 p.m.[8] on October 5, 2011, Dunn attended a pre-arranged meeting with John Doe # 2, a cooperating witness, in the vicinity of Junior's Restaurant ("Junior's"), near the intersection of Flatbush and De-Kalb Avenues in Brooklyn, New York. (*See* Transcript of Evidentiary Hearing, May 20, 2013 (the "May 20 Tr."), at 6, 45–46.) At the instruction of Agent Richards, Dunn had been led to believe that the purpose of the meeting was for Dunn to collect certain monies from John Doe # 2. (*See id.* at 45.) Upon his arrival outside Junior's, Dunn parked his vehicle and entered into the passenger side of a vehicle driven by John Doe # 2, Unbeknownst to Dunn, ten federal agents were gathered in the immediate area, some in uniform and some in plain clothes.[9] (*See id.* at 31, 36–37.) Upon Dunn's entry into John Doe # 2's vehicle, four of them approached—two on the driver's side and two on the passenger side—and placed Dunn under arrest. (*Id.* at 7, 32.) Each of these four agents was armed with a holstered weapon and at least two of them were wearing bulletproof vests that were visible over their clothing. (*Id.* at 37–38.) None of the agents present at the scene drew his weapon during the arrest.[10] (*Id.*)

---

rights guaranteed under *Miranda*, and provides, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." A copy of this form was also submitted as Government Exhibit 1 at the May 20, 2013 Evidentiary Hearing.

7. Supplemental Affidavit of Stevenson Dunn, February 5, 2013, ECF Document # 129.

8. Dunn avers that the time of his arrest was around 6:20 p.m. (Dunn Aff. ¶ 2; *see also* Dunn Supp. Aff. ¶ 2.) This assertion, however, is contradicted by the arrest log (Mem. in Opp., Ex. 2) as well as by the credible testimony of Agent Richards.

9. Agent Richards identified the other agents who participated in Dunn's arrest as Robert Hanratty, Ian Thomas and Michael Gaeta, special agents with the FBI; Joseph Delia Penna, LaValle Jackson and Ken Jaloutot of the Department of Labor; Henry McCabe of the Internal Revenue Service; and Michael Granastein of Housing and Urban Development. (May 20 Tr., at 31.)

10. Dunn asserts that "[s]everal of the agents had their weapons drawn and pointed at the both of us." (Dunn Aff. ¶ 8.)

Once Dunn was removed from John Doe # 2's vehicle, he was handcuffed and patted down, and then moved to Agent Richards's vehicle, where he was placed, still handcuffed, within two to three minutes after his arrest. (*See id.* at 8, 40–41.) He was not provided with a statement of his *Miranda* rights at that time. (*Id.* at 40–41.)

Immediately following the arrest, Agent Richards explained to Dunn that his vehicle would be moved so that it would not get towed or ticketed, and he obtained Dunn's verbal consent to search the vehicle "for items that would perhaps be harmful to agents and things that might be relevant to the investigation such as business documents." (*Id.* at 9; *see also id.* at 48–49.) Around this time, Agent Richards also asked Dunn if he took any medication, to which Dunn replied that "he took pills for diabetes." (*Id.* at 51.) Although they looked for such pills, the agents did not recover any medication during their search of Dunn's vehicle, and they were then "just instructed to take the car back over near [26 Federal Plaza] and we'll worry about it when get over there." (*Id.* at 52.)

Agent Richards testified that, after the other agents had completed the search of Dunn's vehicle, he and FBI Special Agent Ian Thomas ("Agent Thomas") transported Dunn in Agent Richards's vehicle to 26 Federal Plaza, in Manhattan, where he would be interviewed. (*See id.* at 8–9, 52–53.) Agent Richards drove, and Dunn was seated in the back, still handcuffed, with Agent Thomas seated next to him. (*See id.* at 9, 47.) Dunn's car was driven to the same location in Manhattan by one of the other agents. (*Id.* at 52.) Neither Agent Richards nor Agent Thomas read Dunn a

statement of his *Miranda* rights while in the car. (*See id.* at 50–51, 53.)

Agent Richards further testified on direct examination that, while en route to Manhattan:

As is typical, when you arrest individuals, they tend to question you: Why am I here? What's this about? So there was an active conversation between Stevenson Dunn and myself as to what put him in that car and what was going to happen in the near future as far as arrest processing and how his evening was going to go.

(May 20 Tr., at 10.) Then, in response to a question from Dunn about the charges against him, Agent Richards testified:

A I stated that he was charged with RICO, and that it involved several crimes, one of which that [sic] was extortion.

Q Did you tell him where he was going to be brought?

A Yes. I told him we were heading to 26 Federal Plaza.

Q Was there any discussion about threatening someone?

A Yeah. In the back and forth between Stevenson Dunn and myself when I said: You know, you've been arrested and charged with RICO and extortion. He said: Extortion, I don't know anything about extortion.

I said: Yeah, right, like you've never threatened anything [sic] anyone like George Armstrong's nephew.[11]

Then he replied: Well yeah, I did that.

And I immediately changed the conversation to well let me tell you about how your evening is going to go. We're going to get back to 26 Federal

---

11. On cross-examination, Agent Richards clarified that the person he suggested had been threatened by Dunn was George Armstrong's brother, not his nephew. (May 20 Tr., at 61.)

Plaza, we're going to do fingerprints, we're going to do photographs. We're going to sit down and we'll have a chance to talk at that time.

(*Id.* at 10–11.) On cross-examination, Agent Richards further testified:

A. The only question I asked [Dunn] was in regard to a question that he asked me. He asked me: Why am I here? You know, what am I doing in this car? I explained to him that he'd been arrested for RICO and that involved extortion. And he replied, you know, what do you mean, extortion? What do you mean by that? And I said: You know why you're here. He said: No, no, I don't. I said: Yeah, right, like you've never, ever threatened George Armstrong's brother. And then he replied: Well, yeah, I did it. Which I moved the conversation to, let me tell you how it's going to go the rest of the night. We can talk about that later. That was it.

(*Id.* at 60.)

Upon arrival at 26 Federal Plaza, the agents brought Dunn, still in handcuffs, to an interview room on the 23rd floor, where his left handcuff was secured to a bar near the interview table. (*Id.* at 12.) Agent Richards and Special Agent Joseph Delia Penna of the Department of Labor ("Agent Delia Penna") were present in the interview room at all times, with the exception of a two-to-three minute period immediately after their arrival during which Agent Richards returned to his desk. (*Id.* at 12–13, 72.) Upon his return to the interview room, Agent Richards, along with Agent Delia Penna, began the interview.[12] Agent Richards testified that the "very first thing [they] went over," at

approximately 8:45 p.m., was the reading to Dunn of his *Miranda* rights from the Advice of Rights Form, which was signed by Dunn at 8:48 p.m. (*Id.* at 13–14; *see also* Mem. in Opp., Ex. 1.)

In response to a question during direct examination about the way in which the *Miranda* rights were administered, Agent Richards testified as follows:

A. I held the form; I read them off the form; and then I handed him the waiver form so that he could review it.

Q. Okay. For the record, could you just read what it is you read off the form to Mr. Dunn?

A. Yes.

These are your rights. Before we ask you any questions, you must understand your rights.

You have a right to remain silent. Anything you say can be used against you in court.

You have a right to talk to a lawyer for advice before we ask you any questions.

You have a right to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before questioning if you wish.

If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

(May 20 Tr., at 14–15.)

Agent Richards further testified that Dunn was given a chance to read the form and that it appeared that Dunn did, in fact, read it. (*Id.* at 15.) Then, when asked, also on direct examination, whether, "in response to either hearing the questions or

---

**12.** Dunn avers that there were three agents seated at one side of the table, that he was seated opposite them, and that there was a fourth agent standing behind him "the entire time [he] was being questioned in that room." (Dunn Aff. ¶ 19.)

reading the document," Dunn "raise[d] the name of any lawyers during the conversation," Agent Richards testified:

A   Yes, he did.

Q   And how did that come about if you can describe it?

A   When I read him the rights, he said: I want to talk to Lee Hymowitz, I believe.  And I said: Well, that's not going to do you any good because he's going to be arrested in the morning and you'll get to see him in the bullpen area after you've been arrested.

Then he said: Well how about Mike Freeman?

And I said:  Well, he'll be arrested too.  You'll be able to see him tomorrow.

Q   Did he say something in response to that?

A   Yeah. At that point, he said: Oh, I see where this is going and I'm not going to go down for the two Jewish attorneys or lawyers. And he grabbed the form closer to himself and he signed it.

Q   Did he ever name a third lawyer named Tariq Davis?

A   Not that I recall.

Q   Did he ask you any other questions before he signed the form about any other rights that were mentioned in those forms you just read?

A   No, he did not.

(*Id.* at 15–16.)

On cross-examination, Agent Richards testified that he knew that both Hymowitz and Freeman were attorneys and that both men were also Dunn's partners and subjects in the investigation:

Q   And did you know who Lee Hymowitz was?

A   Yes, I did.

Q   How did you know that [sic] Lee Hymowitz was?

A   He was a subject in the investigation.

Q   So you had reason to know that Mr. Hymowitz was an attorney; is that correct?

A   Yes.

Q   You had reason to know that Mr. Hymowitz was, in fact, an attorney of record for Mr. Dunn; is that correct?

A   No, I did not know if he ever represented Mr. Dunn.

Q   You didn't know that he was an attorney of record for Mr. Dunn?

A   I knew that he was a partner.

(May 20 Tr., at 77–78.)  He further testified that when Dunn asked to speak to Lee Hymowitz, Agent Richards "replied to him that [Hymowitz] can't help you, he's going to be arrested tomorrow morning." (*Id.* at 83.)

Q   He can't help you?

A   Yes, Right now because you can't talk to him and he can't help you.

Q   So?

A   Meaning, he's going to be arrested [and] you'll see him tomorrow.

. . .

A   You can't talk to him, he's not going to be able to help you, he's being arrested tomorrow morning.

. . .

Q   After he sought to speak with Mr. Hymowitz, who you knew to be an attorney, what else did Mr. Dunn do?

A   He said to me:  How about Michael Freeman?

Q   How about Michael Freeman.  Did you know who Michael Freeman was?

A    Yes, I did.

Q    Who did you know Mr. Michael Freeman to be?

A    Lee Hymowitz and Steven[son] Dunn's partner, also a lawyer.

Q    So you knew that Michael Freeman was an attorney?

A    That's correct.

Q    So after asking to speak to Lee Hymowitz and being rebuffed, before he signs the consent to be interviewed, he asks to speak to Michael Freeman who you knew to be an attorney and what did you say or do?

A    I replied to him that he was in the same boat as Hymowitz and he'll see him tomorrow morning. And I also knew that they were partners under investigation. It wasn't strictly this is an attorney, I need to talk to an attorney, you know, this was maybe I'm feeling it out to see if my partners are in trouble like me to size up my situation.

Q    So you interpreted his request?

A    I had a conversation about his request.

Q    But you interpreted his request as you have just demonstrated in your testimony?

A    That's what it meant to me.

(*Id.* at 83–85.)

Defense counsel subsequently asked if Agent Richards had "offer[ed] Mr. Dunn access to a court-appointed attorney or a federal defender after he asked to speak to Mr. Freeman?" (*Id.* at 91.)

Agent Richards replied:

A    No, he didn't ask. After he asked to speak to them he still had the written advice [of rights form] in front of him and he indicated that he understood, you know, the clause about he

can have a lawyer present, and if you want a lawyer at any time you could stop the interview. And he immediately, once he decided that his coconspirators were going to be in court the next day, he made a statement to me: I see where this is going and I'm on board, I bought a ticket. He grabbed the paper and signed it and then he started the answers, you know, question-and-answering session.

Q    I understand that. You said he decided, how do you know that he decided?

A    What do you mean he decided?

Q    How do you know he decided?

A    Because he emphatically grabbed this paper, pulled it over, and signed it. [And said] I see where this is going.

(*Id.* at 91–92.)

Defense counsel later asked whether, when Dunn asked to speak with Michael Freeman, Agent Richards believed that to be an invocation of his right to counsel, to which Agent Richards responded, "No."

Q·   Do you recall that he asked to speak to Tariq Davis?

A    I never heard that name.

Q    Do you recall that he asked to speak to Yelaine Nicholson?

A    I never heard that name either.

(*Id.* at 93–94.)

Once Dunn signed the waiver form, Agent Richards proceeded with the interview while Agent Delia Penna took notes. (*Id.* at 16–17.) Agent Richards testified that "on several occasions" he tried to end the interview because "this was the evening before a large operation and we had gotten a post-arrest statement," and Agent Richards wanted to "start the process of

getting done for the night because we had to get up quite early." (*Id.* at 18.) However, in response, "on multiple occasions [Dunn] said, 'Officer Richards, please sit down, I'm not done talking.'" (*Id.*) He further testified that Dunn indicated several times during the interview that he intended to cooperate by making comments like, "I see where this is going. I bought a ticket for this show; I bought a bus ticket, I'm on board" (*id.* at 18), and "I'm not a ... the black guy is not going to be taking it on the chin for the two Jewish lawyers" (*id.* at 92). Agent Richards stated that he explained to Dunn that, in order to cooperate, he would need to "sit down with his lawyer, be straight up truthful with the lawyer, and have his attorney reach out with the U.S. Attorney in the morning and get the ... ball rolling on cooperation." (*Id.* at 18–19.)

Throughout the course of the interview, Dunn was offered food and water, which he refused. (*See* May 20 Tr., at 17, 70–71.) He was also given the opportunity to use the restroom on at least one occasion. (*Id.* at 70.) Agent Richards testified that Dunn did not ask for medical assistance, he did not complain that he was not feeling well, and he did not in any way indicate a need for medication.[13] (*See id.* at 17, 71.) At some point during the interview, according to Agent Richards:

> ... [Dunn] said, you know, my medication is in the vehicle in the glove box [and] we sent one of the agents down to his vehicle that was parked in the vicinity of 26 Fed. And they looked through the vehicle, couldn't find it, came back, and when they were finished, before

[Dunn] was transported to MDC, and 1 instructed the individuals that were processing him to take him to his vehicle and retrieve his medication.

(*Id.* at 21–22.) However, Agent Richards testified that Dunn never appeared to be in any medical distress or have any difficulty communicating, nor did he at any point say that he needed his medication in order to continue speaking. (*Id.* at 22; *see also id.* at 86–88.) Rather, the subject of Dunn's medication came up only because Agent Richards asked if Dunn had any medication that he needed to take on a regular basis, since generally, a prisoner will not be lodged overnight at the Metropolitan Detention Center ("MDC") without at least one day's worth of any necessary medication. (*See id.* at 66–67.) Furthermore, when Agent Richards was asked, on cross-examination, about his experience interacting with diabetic persons and how he could conclude that Dunn was not in a state of diabetic shock at any time during the interview, he replied:

A   You know, nobody, meaning, Stevenson Dunn never said, I need my medication; I don't feel right. I'm starting to slip into my diabetic shock; I'm having problems here.

Q   What type of diabetes does Mr. Dunn have?

A   I don't know.

Q   So how could you determine what symptoms were best indicators of his lucidness?.

A   I would determine it from the way in which he handled himself during the course of our interview. My interac-

13.   Dunn contends, "I believe that I was purposely kept from maintaining my proper medication schedule by the agents to my detriment. I repeatedly and fervently asked for my medication and directed the agents as to how to retrieve it from my vehicle. It was never provided to me by the agents who were questioning me." (Dunn Aff. ¶ 38.) As set forth below (*see infra,* n. 16,), there is no dispute that the medication was not provided until sometime after the conclusion of the interview. Nonetheless, Agent Richards's testimony as to Dunn's failure to request medication is credible.

tion with him, he was normal as he sits here today.

. . .

Q  Do you know how many times he stopped to or asked to use the restroom during your interview?

A  Not often. Perhaps one.

Q  Could you tell whether or not his vision was getting blurry?

A  No, I couldn't tell.

Q  Could you tell whether or not he was experiencing hot flashes?

A  No.

Q  [C]ould you tell what his blood sugar was?

A  No.

Q  Could you tell if he was drowsy?

A  He wasn't drowsy.

Q  You could tell?

A  He was very animated.

. . .

Q  Could you tell if his thinking, reasoning or cognitive skills were impaired?

A  I don't believe that his reasoning or his cognitive skills were impaired simply for the fact that the questions that I asked him he answered with great detail; corroborated information that I had learned throughout the investigation; things that it

wasn't just luck, he gave me detailed information.    .

Q  Had you ever had a conversation with Mr. Dunn before that?

A  No.

Q  So you had no normative state to compare this to?

A  No. I had recordings I had listened to his recordings.

Q  You had listened to recordings?

A  Consensual ones.

(*Id.* at 86–89.)

The interview lasted approximately 45 minutes,[14] and upon its conclusion at around 9:30 p.m., Dunn was taken through "arrest processing," which was completed at approximately 11:40 p.m. (*See id.* at 20–21.) Agent Richards testified that, between 11:40 p.m. and 12:45 a.m., Dunn, accompanied by Special Agent Michael Granastein[15] of the Department of Housing and Urban Development and Special Agent Rob Hanratty of the FBI, retrieved his medication and some food from his vehicle and that he was then transported to the MDC. (*See id.* at 21–22, 69–70.) Although Agent Richards testified that he was not present when the food and medication were obtained, he testified, credibly, as to his understanding of these events. He further testified that if Dunn needed medication to which he did not have ac-

---

**14.** Dunn avers that he was questioned for approximately five or six hours. (*See* Dunn Aff. ¶ 25.) Agent Richards testified, however, that the interview concluded at around 9:30, and that there were "other things that went on after the interview was over," leading to the conclusion of the arrest processing at around 11:40. (*See* May 20 Tr., at 20–21.) Although it is not clear what "other things" Agent Richards was referring to, the arrest log indicates that the arrest processing was completed at 11:40. (Mem. in Opp., Ex. 2.) Agent Richards testified credibly as to his recollection of the duration of the interview, but, even if he was mistaken and it ended

closer to 10:00 or 11:00, there is nothing in the record to support Dunn's assertion that the questioning continued for five or six hours.

**15.** Although this agent's last name appears as "Granatstein" on the arrest log, it is spelled "Granastein" throughout the May 20 Tr. (*Compare* Mem. in Opp., Ex. 2 *with* May 20 Tr., at 22, 31, 67–69, 74, 94–97.) There appears to be no dispute that both names refer to the same person. For the sake of clarity, I use the spelling that appears in the transcript.

cess, then he would not have been accepted at MDC and

> Agent Granastein would have had to stay with him all night long until the next day. And if, in fact, he was not fit for confinement then he would have had to take him to a medical facility and gotten a letter of fit for confinement and then attempted to take him there again.

(*Id.* at 69.) [16]

Agent Richards testified that Agent Delia Penna took notes during the interview and that those notes were later written up, by Agent Delia Penna, into the FBI 302 form submitted by the government in connection with its opposition papers. (Mem. in Opp., Ex. 3.) Although Agent Richards testified that he typically completes his 302 forms within five days after the interview, this form was written up thirteen days later. (May 20 Tr., at 75.) Nonetheless, Agent Richards testified, credibly, that the FBI 302 form, as written by Agent Delia Penna, accurately reflected the information ascertained during the interview. (*Id.* at 75–76.)

## C. The Post–Hearing Submissions

At the request of the court, both Dunn and the government submitted post-hearing summations of their respective positions. In his submission, Dunn reiterates his argument that the statement made while in transit from Brooklyn to 26 Federal Plaza must be suppressed because of the absence of *Miranda* warnings. Dunn also argues that Agent Richards's testimony regarding Dunn's requests to speak to Hymowitz and Freeman conclusively demonstrate that Dunn was impermissibly denied access to counsel, in violation of his rights under the Fifth and Fourteenth Amendments.[17] Finally, Dunn argues that, notwithstanding the signed Advice of Rights Form, the government has not established by a preponderance of the evidence that Dunn knowingly and voluntarily waived his rights.

In response, the government submitted its post-trial memorandum on June 13, 2013. The government argues that the statement made while in transit is admissible even without the *Miranda* warnings because it was not the product of interrogation. The government further argues that Agent Richards's testimony conclusively demonstrates that Dunn was not coerced into signing the Advice of Rights Form and refutes Dunn's suggestion that his medical condition rendered him unable to knowingly and voluntarily waive his

---

16. Some of the questions on this topic posed by defense counsel during Agent Richards's cross-examination appeared to suggest that Dunn did not actually receive his medication until the following morning. (*See* May 20 Tr., at 89–90.) This line of questioning did not serve to impeach the credibility of Agent Richards, as I found his testimony on *his understanding* as to the timing of the retrieval and administration of the medication to be credible. Moreover, for the purposes of this motion, the relevant question is whether or not Dunn requested his medication during the course of his interview and was denied access to it. There is no dispute that his medication was not obtained until sometime after the conclusion of the interview. (*See id.* at 95–98.)

17. Although Dunn does not, in his post-hearing memorandum, expressly state the Constitutional basis of the rights he asserts have been violated, he argues in his moving papers (albeit in conclusory fashion) that this motion arises under *Miranda*, the Fifth and Sixth Amendments, and "his right to due process." (Mem. in Supp. 12.) It is well-settled that the *Miranda* warnings serve to protect the right to be free from self-incrimination guaranteed by the Fifth Amendment. *See, e.g., Miranda*, 384 U.S. 436, 86 S.Ct. 1602; *see also, e.g., Moran*, 475 U.S. at 420, 106 S.Ct. 1135. As previously stated, the Sixth Amendment is not implicated here. (*See supra*, n. 3.)

rights. Finally, the government argues that Dunn's requests to speak to Hymowitz and Freeman do not amount to an invocation of his right to counsel because he did not unambiguously ask to speak to an attorney, but rather, to his co-conspirators who also happen to be attorneys.

## II. Findings of Fact

Having heard the testimony of Agent Richards and observed his demeanor throughout the hearing, I conclude that he was a credible witness. He was candid, he was forthcoming, and he appeared at all times to be telling the truth. Much of his testimony was also corroborated by the documentary evidence submitted by the government.

The version of events set forth in Dunn's affidavits differs from the narrative provided by Agent Richards in many respects, as noted above.[18] Dunn, however, elected not to testify and subject himself to cross-examination, thereby leaving the court without a means to gauge his credibility or the reliability of his assertions. Moreover, Dunn has offered no other testimonial or documentary evidence in support of his assertions. In the absence of any such evidence, and in light of the highly credible testimony of Agent Richards, I note those instances where Dunn's recollection differs from that of Agent Richards, but accord the distinctions little weight. *See, e.g., United States v. Frank*, 8 F.Supp.2d 284, 291 n. 2 (S.D.N.Y.1998) (where the testimony of law enforcement officers was credible, and where the defendant did not testify and was not subject to cross-examination, the defendant's contradictory recollection of certain events, as set forth in his affidavit, "carries little weight").

Accordingly, I accept Agent Richards's recitation of the events surrounding Dunn's arrest and post-arrest statement and, to the extent necessary and as set forth below, adopt the above narrative as my findings of fact.

## III. Analysis

### A. Custodial Interrogation

#### 1. Applicable Law

In *Miranda v. Arizona*, the Supreme Court concluded that certain safeguards are necessary in order to protect a defendant's rights against self-incrimination under the Fifth Amendment. In that decision, the Court held that any statements stemming from "custodial interrogation" may not be offered by the prosecution absent a showing that the police used "procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. Such procedural safeguards include the provision of the by-now well-recognized statements regarding the defendant's right to remain silent and right to an attorney. *Id.*

In *Rhode Island v. Innis*, the Supreme Court defined "interrogation" under *Miranda* to include "either express questioning or its functional equivalent." 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). It held that "the term 'interrogation' under *Miranda* refers not only to express questioning but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682.

■ Where, as here, a defendant "has alleged police custodial interrogation in the absence of *Miranda* warnings, the burden shifts to the government to prove *Miranda* voluntariness, either because there was no custodial interrogation implicating *Mi-*

---

**18.** *See supra,* n. 8; n. 10; n. 12; n. 13; n. 14.

*randa,* there was some exception to the *Miranda* rule, or because [the defendant] was properly *Mirandized* and waived his rights." *United States v. Miller,* 382 F.Supp.2d 350, 362 (N.D.N.Y.2005); *cf. United States v. Wyche,* 307 F.Supp.2d 453, 457 (E.D.N.Y.2004) ("On a motion to suppress evidence in a criminal trial, once [defendant] establishes a basis for his motion, the burden rests upon the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers").

## 2. The Unwarned Statement Made During Transit is the Inadmissible Product of Custodial Interrogation

The government argues that the intent of Agent Richards, while speaking with Dunn during the drive from Brooklyn to 26 Federal Plaza, was benign. However, the benign intent of the law enforcement officer is not the primary consideration under *Innis.* Rather, the definition of interrogation is focused on the perceptions of the suspect, as the protections of *Miranda* are to be applied "without regard to objective proof of the underlying intent of the police." *Innis,* 446 U.S. at 301, 100 S.Ct. 1682. While the police need not be held accountable for the unforeseeable consequences of their words or actions, the definition of "interrogation" applies to those "words and actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 302, 100 S.Ct. 1682 (emphasis in original). "[T]his is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." *Id.* at 302 n. 7, 100 S.Ct. 1682. Thus, whether or not Agent Richards intended his question about Dunn's having

threatened George Armstrong's brother to elicit so obviously incriminating a response as Dunn's statement, "well yeah, I did that," an incriminating response to such a question is clearly foreseeable, and Agent Richards should have known that his query was reasonably likely to elicit one.

The government's reliance on *United States v. Gelzer,* 50 F.3d 1133 (2d Cir. 1995), to support its contention that Dunn was not subjected to interrogation during the ride from Brooklyn to Manhattan is misplaced. In that case, the defendant Ronald Gelzer was arrested in connection with the armed robbery of a postal truck in the early evening of December 31, 1992. *Gelzer,* 50 F.3d at 1137. Subsequently, while en route to the police station, one of the two detectives in the squad car "commented on the disruption of plans for New Year's Eve. Without further stimulus, Ronald Gelzer stated: 'We're amateurs, not professionals.'" *Id.* The Court of Appeals for the Second Circuit affirmed the district court's conclusion that the defendant's incriminating statement was not elicited by custodial interrogation, since "the only question directed at Ronald Gelzer was an inquiry as to what Gelzer's New Year's plans had been. Neither the topic of this sociable question nor the general tenor of discussion created an atmosphere that was 'reasonably likely to elicit an incriminating response.'" *Id.* at 1138 (quoting *Innis,* 446 U.S. at 302, 100 S.Ct. 1682).

█ In contrast, both the question asked by Agent Richards and the general tenor of discussion in the vehicle en route to Manhattan created an atmosphere that the agent should have known was likely to elicit an incriminating response. First, Agent Richards asked Dunn directly whether or not he had threatened someone. Any response to such a question is

likely to be incriminating, whether an affirmative one, as here, or a negative one, which would have the potential to be used for impeachment purposes.[19]

Moreover, although Agent Richards testified that his comments in the vehicle were merely answers to Dunn's questions about the nature of the charges against him, he also testified that the agents planned to arrest Dunn before the other alleged co-conspirators because "there was the potential that Mr. Dunn would add to our investigation and allow us to ... broaden the investigation .... there was always that potential that he could take us in another direction in the case." (May 20 Tr., at 26.) As stated, although the primary consideration under *Innis* is the objective inquiry into whether the agent should have been aware of the likelihood of an incriminating response, the subjective intent of the agent is not wholly irrelevant. *See Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir.2005) (quoting *United States v. Mata–Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983) ("The test is objective. The subjective intent of the agent is relevant but not conclusive.")). Agent Richards's subjective belief that Dunn could assist in "broadening" the investigation, i.e., cooperate, should have rendered him even more aware of the probability that his question about the threat was likely to elicit an incriminating response.

In sum, Dunn's statement was the product of custodial[20] interrogation made in the absence of the procedural safeguards designed to ensure protection of the privilege against self-incrimination, and it is suppressed.

The suppression of Dunn's first statement, however, does not bear on the suppression or admissibility of his subsequent statements. Rather, " 'absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion' with respect to subsequent statements that the suspect makes after receiving *Miranda* warnings." *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir.2003) (quoting *Oregon v. Elstad*, 470 U.S. 298, 314, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)). Although "*Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent [post-warning] statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Elstad*, 470 U.S. at 309, 105 S.Ct. 1285. While it is clear that Dunn's pre-warning statement must be suppressed, as set forth above, there is nothing in the facts to support a conclusion that "the circumstances surrounding [Dunn's] unwarned confession were so coercive as to prevent him from making a subsequent knowing and voluntary waiver of his rights, thereby requiring the suppression of his post-*Miranda* confession." *Parsad*, 337 F.3d at 183. I must therefore determine whether or not Dunn's post-arrest statement was knowingly and voluntarily made.

Before turning to that question, however, it is necessary, first, to address whether or not Dunn unambiguously invoked his right to counsel.

**19.** Indeed, in the absence of the *Miranda* warnings, the admission of both exculpatory and inculpatory statements stemming from custodial interrogation is prohibited. *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.

**20.** There is no dispute that Dunn was in custody at this time. (*See* May 20 Tr., at 42, wherein Agent Richards testifies, "We took [Dunn] into custody when we pulled him out of the [cooperating witness's] vehicle.")

## B. Invocation of the Right to Counsel

### 1. Applicable Law

■ *Miranda* provides that "the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege" against self-incrimination and that effective protection requires "not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires." *Miranda*, 384 U.S. at 469–70, 86 S.Ct. 1602. Accordingly, once the required warnings have been given, should the suspect request an attorney, all interrogation must cease until an attorney is present. *See id.* at 473–474, 86 S.Ct. 1602. "At this point [the suspect] has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 474, 86 S.Ct. 1602. Therefore, once the defendant has invoked the right to have counsel present during the custodial interrogation, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." [21] *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). "The rationale of *Edwards* is that once a suspect indicates that he is not capable of undergoing [custodial] questioning without advice of counsel, any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is the product of the inherently compelling pressures and not the purely voluntary choice of the suspect." *Maryland v. Shatzer*, 559 U.S. 98, 105, 130 S.Ct. 1213, 175 L.Ed.2d 1045 (2010) (alteration in original) (internal quotation marks omitted).

When considering a possible violation of the *Miranda* right to counsel, the primary inquiry is "whether the accused *actually invoked* his right to counsel." *Davis v. United States*, 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (emphasis in original). This inquiry is an objective one:

> Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.

*Id.* at 459, 114 S.Ct. 2350 (emphasis in original) (internal quotation marks and citation omitted).

Thus, in order to effectively invoke his right to have an attorney present, a suspect must make an objectively unambiguous request. While he "need not 'speak with the discrimination of an Oxford don,' he must articulate his desire ... sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* (quoting *id.* at 476, 114 S.Ct. 2350 (Souter, J., concurring)). This "standard applies to both the right to counsel and the

---

21. There are thus two components to the inquiry: first, whether the right to counsel has actually been invoked, and second, if it has been, whether the suspect subsequently initiated further discussions and knowingly and intelligently waived the right he had invoked. *See Smith v. Illinois*, 469 U.S. 91, 94–95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). I note, however, that the government argues only that Dunn waived his rights by signing the Advice of Rights form and does not contend that there was any waiver arising out of Dunn's initiation of further discussions with Agent Richards.

right to remain silent, and it applies where, as here, a court evaluates an initial rather than subsequent invocation." *United States v. Plugh*, 648 F.3d 118, 123 (2d Cir.2011).

■ If the "accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 2259–60, 176 L.Ed.2d 1098 (2010).

## 2. Dunn's Request for Counsel was Not Unambiguous

■ As set forth above, Agent Richards's testimony makes clear that Dunn asked to speak to Hymowitz and then Freeman immediately after the contents of the Advice of Rights Form had been read to him and reviewed by him. (May 20 Tr., at 15–16.) Agent Richards confirmed that Dunn mentioned the names of Hymowitz and Freeman "in response to" being presented with the Advice of Rights Form, stating, "When I read him the rights, he said: I want to talk to Lee Hymowitz, I believe." (*Id.* at 16.) Then, upon hearing that Lee Hymowitz was going to be arrested, Dunn said, "Well how about Mike Freeman?" (*Id.*) After his requests to speak to these two men were refused, Dunn said, "Oh I see where this is going and I'm not going to go down for the two Jewish attorneys or lawyers. And he grabbed the form closer to himself and he

signed it." (*Id.*) Dunn argues that these two consecutive requests to speak to two men who were known by the agent to be attorneys were clear and unequivocal requests for counsel and that the failure of Agent Richards to honor these requests renders his statement inadmissible. Dunn further argues that Agent Richards's testimony demonstrates that he improperly "established his own criteria for invocation of a defendant's right to counsel." (Dunn Post–Hearing Mem. 15.)

Viewing Dunn's statements objectively, from the perspective of a reasonable officer in the circumstances, I cannot conclude that he unambiguously requested an attorney, and Dunn's contention with regard to the impropriety of the agent "establish[ing] his own criteria" is without merit.[22]

■ In order to invoke the right to counsel as guaranteed by *Miranda*, a suspect "must at a minimum make some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation*." *United States v. Oehne*, 698 F.3d 119, 122–23 (2d Cir.2012) (emphasis in original) (internal quotation marks and citation omitted). As noted in *Oehne*:

> Statements such as: "Maybe I should talk to a lawyer," *Davis v. United States*, 512 U.S. 452, 462, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (internal quotation marks omitted); "Do you think I need a lawyer?" *Diaz v. Senkowski*, 76

---

**22.** During the suppression hearing, I allowed Agent Richards to testify, over the government's objection, as to his understanding of what an effective invocation of the right to counsel might sound like. (*See* May 20 Tr., at 78–82.) As I stated during the hearing, however, I permitted the testimony not because the agent's subjective state of mind would bear on the legal question of whether or not

the right to counsel had been invoked, but rather, on the basis that testimony as to the agent's understanding of the events as they unfolded during the interrogation would be likely to provide additional insight into what actually happened that evening, consistent with the purpose of the evidentiary hearing. (*Id.* at 82.)

F.3d 61, 63 (2d Cir.1996); and a suspect's statement that he "was going to get a lawyer," *United States v. Scarpa,* 897 F.2d 63, 68 (2d Cir.1990), have been found to be insufficient to constitute an unambiguous request for counsel. *Id.* at 123. Similarly, even a defendant's statement that he was represented by counsel in another matter was held not to be an unambiguous invocation of the right to counsel, but rather, merely a defendant "inform[ing] the officers that he had a lawyer for an unrelated charge." *Id.*

Here, while the evidence is clear that Dunn unequivocally asked to speak with Hymowitz and Freeman, it is not clear that his request for them was an effort to speak to *an attorney.* A reasonable officer in these circumstances would have known, as Agent Richards did, that these two men were Dunn's business partners and alleged co-conspirators. And such a reasonable officer would have properly denied Dunn access to them. Dunn made no further request to speak with anyone at all—lawyer or otherwise [23]—and, while a reasonable officer in these circumstances might have understood that Dunn *might* be requesting access to a lawyer rather than to his soon-to-be co-defendants, such a suspicion does not, under "our prece-

dents ... require the cessation of questioning." *Davis,* 512 U.S. at 459, 114 S.Ct. 2350. "Unless the suspect *actually requests an attorney,* questioning may continue." *Id.* at 462, 114 S.Ct. 2350 (emphasis added).

This conclusion is buttressed by Dunn's statement, immediately upon learning that Hymowitz and Freeman were also going to be arrested, to the effect of, "Oh, I see where this is going and I'm not going to go down for the two Jewish attorneys" and his "emphatically grab[bing]" and signing the Advice of Rights Form. (May 20 Tr., at 16, 92.) This statement and accompanying act indicate a desire to seize the opportunity to cooperate in advance of the arrest of co-defendants, not a desire to cut off questioning until an attorney is obtained. Where the defendant's "conduct and statements were, on the whole, unclear, conflicted, and ambiguous, we cannot conclude that he invoked his rights in a manner sufficient to cut off all further questioning." [24] *Plugh,* 648 F.3d at 126.

Accordingly, since Dunn did not unambiguously request an attorney, Agent Richards did not violate his *Miranda* rights by continuing with the interrogation.[25] The inquiry, however, does not end there, since, in order for Dunn's post-warning

---

**23.** Notwithstanding Dunn's contention to the contrary, there is no credible evidence as to his purported request to speak with Tariq Davis.

**24.** *Smith v. Illinois* does not compel a different result. In that case, the Supreme Court held that, where the request for counsel was, *at the outset,* unambiguous, "an accused's postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." *Smith,* 469 U.S. at 92, 105 S.Ct. 490. Here, Dunn's initial request was ambiguous, and *Smith* therefore does not apply. *See James v. Marshall,* 322 F.3d 103, 108–09 (1st Cir.2003) (noting that the holding in *Smith* "was premised on the *unambiguous* assertion of rights" under *Miranda* ) (emphasis in the original);

*see also Mays v. Clark,* 2012 WL 1037942, at *16 (E.D.Cal., March 27, 2012) (noting that the *Smith* holding was " 'narrow' and did not address 'the circumstances in which an accused's request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself,' or the consequences of such ambiguity or equivocation." (quoting *Smith,* 469 U.S. at 99–100, 105 S.Ct. 490)).

**25.** It also bears noting that Dunn relies principally upon *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), to support his contention that he unambiguously invoked his right to counsel. (*See* Dunn Post–Hearing Mem. 16–17.) That case, however, is wholly inapposite insofar as

statement to be admissible, the government must also show that it was obtained after a voluntary and knowing waiver of rights.

## C. Effectiveness of Waiver

### 1. Applicable Law

Once a suspect has been informed of his rights under *Miranda*, he may waive them, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602. It is the government's burden to demonstrate satisfaction of this standard by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

The defendant's waiver of his rights must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421, 106 S.Ct. 1135. "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir.1991). Determination of whether the confession is voluntary requires "a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *Anderson*, 929 F.2d at 99; *accord Parsad*, 337 F.3d at 183.

The defendant's waiver must also be knowing, insofar as it must be made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421, 106 S.Ct. 1135. "If the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate a valid waiver of *Miranda* rights. The prosecution must make the additional showing that the accused understood those rights." *Berghuis*, 130 S.Ct. at 2261 (internal citations and quotation marks omitted). The court may conclude that a defendant's rights under *Miranda* have been properly waived only if a "totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." *Moran*, 475 U.S. at 421, 106 S.Ct. 1135 (internal quotation marks omitted).

### 2. Dunn Knowingly and Voluntarily Waived His *Miranda* Rights

Dunn argues that his statement was coerced insofar as the interrogation room constituted "an atmosphere of police domination" and "a physical space also dominated by numerous agents during the interrogation." [26] (Mem. in Supp. 10.) He argues that "[t]he actual production of a document [the signed Advice of Rights

---

it dealt primarily with the question of *Miranda's* constitutional basis. The defendant in *Dickerson* had moved to suppress a post-arrest statement he made in the absence of the *Miranda* warnings. 530 U.S. at 432, 120 S.Ct. 2326. The district court suppressed the statement, but the Court of Appeals for the Fourth Circuit reversed, concluding that, although the *Miranda* warnings had not been given, the totality of the circumstances demonstrated that the requirements of 18 U.S.C. § 3501 had been satisfied, and that the confession was therefore obtained voluntarily.

*See id.* The Supreme Court reversed, holding that the warnings required by *Miranda* are constitutionally based and may not be legislatively superseded. *Id.* at 444, 86 S.Ct. 1602. Dunn contends that, in so holding, the Supreme Court "re-stat[ed] its commitment to *Miranda*," but he does not offer any argument as to how this commitment supports a conclusion that the facts of this case demonstrate an unequivocal invocation of his right to counsel. (*See* Dunn Post–Hearing Mem. 16–17.)

**26.** As previously stated (*see supra*, n. 12), Dunn avers that there were "three agents

Form] doesn't excuse the government of its burden to prove that there was *no duress* at the taking of the information contained on that form," and he contends that the testimony of Agent Richards is insufficient to meet this burden. (Dunn Post–Hearing Mem. 13, emphasis in original.) He further argues that he could not have knowingly and voluntarily waived his rights because he was unable to "administer his insulin medication(s) which has been shown to diminish the functioning capacity and mental ability of persons suffering from adult onset diabetes." (Mem. in Supp. 11.) And, "[d]espite the lack of medical testimony," he urges the court to "take into consideration that the real possibility exists that this defendant was deprived of medication necessary to maintain his health." (Dunn Post–Hearing Mem. 18.)

■ Turning, first, to the question of whether Dunn's waiver was voluntary, there simply is nothing in the record to support the conclusion that Dunn's signature on the Advice of Rights Form was obtained through coercion. An examination of Dunn's background and personal characteristics reveals nothing that would indicate an unusual vulnerability or susceptibility in the presence of law enforcement officers. He may be a "middle-aged father of adult children" with no criminal record (*id.* at 8), but he is also a successful real estate entrepreneur whose partnerships in at least three limited liability companies evinces a certain degree of sophistication. His employment as a budget analyst for the New York City Board of Education for thirteen years also suggests a certain degree of education and intelligence. (*See* Mem. in Opp., Ex. 3, at 1.) Even in the absence of specific experience with the criminal justice system, Dunn's level of education and general sophistication indicate that he had the ability to both read and understand the Advice of Rights Form given to him, which clearly set forth both the nature of his rights and the consequences of a decision to waive them.

Next, examination of the conditions of interrogation and the actions of the agents reveals nothing to suggest that Dunn's will was overborne: there is no allegation that he was threatened or promised anything in exchange for his cooperation; he was offered food, drink and the opportunity to use the restroom; and he signed the Advice of Rights Form at 8:48 p.m., after being arrested at 8:05 p.m. and arriving at the interview room at 8:45 p.m.—thus the duration of his time in custody is unlikely to have played a role in subjugating his will.

Dunn's contention that his waiver was neither voluntary nor knowing thus depends entirely on his assertion that the lack of diabetes medication rendered him incapable of making sound decisions on his

---

occupying one side" of the table in the interrogation room, that he "was seated on the other side opposite them," and that "there was another agent standing behind me the entire time I was being questioned in that room." (Dunn Aff. ¶ 19.) This assertion is contradicted by Agent Richards's credible testimony that the only agents present in the room for the duration of the interview were himself and Agent Delia Penna. (*See* May 20 Tr., at 12.)

To the extent Dunn argues that the circumstances of his arrest—the number of officers,

the presence of weapons and bulletproof vests—created an unduly coercive atmosphere (*see* Mem. in Supp. 8–10), I note, again, that Dunn's recollection as to the agents' activities and visibility of weapons is likewise contradicted by the credible testimony of Agent Richards (*see supra*, n. 10). Moreover, even if credited, this contention would support only a conclusion as to the voluntariness of the statement Dunn made while in transit to 26 Federal Plaza and has no bearing on whether his subsequent, post-*Miranda* statement might have been the product of coercion.

own behalf. However, the only support for this assertion lies in the affidavit submitted by Dunn, himself, which, as stated previously, is contradicted by the credible testimony of Agent Richards. Indeed, Agent Richards testified that Dunn appeared to be lucid and animated, that he gave every impression of being in complete command of his cognitive skills, and that he did not ask for or in any way indicate a need for his medication. (*See* May 20 Tr., at 17, 22, 71, 86–89.) In light of this credible testimony, and given Dunn's failure to offer even a single piece of credible evidence to refute it, I conclude that the government has demonstrated by a preponderance of the evidence that Dunn's decision to waive his *Miranda* rights was made knowingly and voluntarily. His post-arrest statement, obtained after such waiver, is therefore admitted and this aspect of Dunn's motion is denied.

Accordingly, Dunn's motion is GRANTED in part and DENIED in part.

SO ORDERED.